Littleton, Judge,
delivered the opinion of the court:
If there has been a taking by the United States under the Fifth Amendment to the Federal Constitution of any property or valuable property rights of plaintiff in and to any of the 20,064.69 acres of timber land involved in this controversy for which a contract to pay just compensation may be implied, such taking must be held to have resulted solely and exclusively from the declared purpose of the United States as expressed in the Act of May 15, 1928, herein referred to as the Flood Control Act, to reduce the height of the riverside levee whenever that should be found to be necessary after the construction of the second, or setback, levee some distance west of the riverside levee. This act authorized a reduction in the riverside levee for a distance of about eleven miles immediately south of Birds Point near Cairo, Illinois, from a maximum grade of 58 feet theretofore authorized by the Mississippi Biver Commission to 55 feet on the Cairo gauge, and a corresponding reduction in the height of a portion of the riverside levee near New Madrid, Missouri, about 35 miles below Birds Point. The setback levee was, for all practical purposes, completed October 31, 1932.
In the adoption of the flood control plan by the provisions of the Act of May 15, 1928,[1] the United States was exercising a lawful power with respect to navigation and navigable waters. In these circumstances it is clear that unless there had been at the time this suit was instituted an actual taking by the United States of property or property rights or a clearly declared intention, by the approval and authorization of the plan or project and the subsequent completion of the floodway, to impose upon the property such a burden or servitude as would deprive the owner of *714 profitable use of his property, there cannot arise, under the Fifth Amendment, an implied contract to pay. A taking of property within the meaning of the Constitution may be accomplished without formally divesting the owner of title to the property or of any interest therein. It is not material whether the property is removed from the possession of the owner, or in any respect changes hands; if it is of such a character and so situated that the exercise of the public use of it, as warranted by the statute, does, in its natural consequences, affect the property by taking it from the owner or depriving him of the possession or some beneficial enjoyment of it, then it is appropriated to public use by competent authority, and the owner is entitled to compensation. Constitutional rights rest on substance, not on form, and the liability to pay compensation for property taken is not avoided by leaving the title in the owner, while depriving him of the beneficial use of the property. Peabody v. United States, 231 U. S. 530, 538, involved the question raised by the demurrer, whether, upon the facts alleged, there had been a taking, and the court said: “It may be assumed that if the Government had installed its battery, not simply as a means of defense in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, whenever it saw fit, in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made.” See, also, Portsmouth Harbor Land & Hotel Co., et al. v. United States, 250 U. S. 1, and Portsmouth Harbor Land & Hotel Co., et al. v. United States, 260 U. S. 327, 329, and Portsmouth Harbor Land & Hotel Co., et al. v. United States, 64 C. Cls. 572. In the last-mentioned case, this court held that “Where the Government sets up coast-defense guns that may be fired over plaintiffs’ lands, but does not so fire them, and the facts fail to show an intention to fire them in times of peace, there is no servitude imposed or intended to be imposed upon the said lands and there is no taking thereof.”
*715 Upon the facts disclosed by the record in the case at bar, we are of opinion that the enactment of the Act of May 15, 1928, adopting the Jadwin Plan and providing for the construction of the setback levee between Birds Point and New Madrid and for the reduction at some future time of the riverside levee at Birds Point to a height equivalent to 55 feet on the Cairo gauge was not a taking or an intention to take from plaintiff any existing valuable property rights theretofore exclusively possessed and enjoyed by plaintiff.
Prior to, at the time, and subsequent to the enactment of the Flood Control Act of May 15, 1928, and the construction of the setback levee plaintiff’s land has been subject to complete inundation by backwaters and headwaters without any cutting down or reduction by the United States in the height of the riverside levee. As shown in the findings, all of plaintiff’s land lies within the backwater area of the Birds Point-New Madrid Floodway. About 99 percent of this land has always been subject to overflow to a depth of 18 feet, and under, by backwater and surface-drainage water when the water of the Mississippi River has reached a stage of 55 feet on the Cairo gauge. Only 245 acres may, therefore, be held not flooded by backwater at such stage. During major floods in various years prior to the enactment of the Flood Control Act all of the land has been completely flooded at various times from backwater and headwater from crevasses in the riverfront levee to a depth of from 5 to 20 feet. The record justifies the conclusion that if the riverside levee was high enough and strong enough to afford complete protection against over-topping and crevassing at 58 feet on the Cairo gauge 100 percent of plaintiff’s land would be overflowed by backwater at a stage of 58 feet.
The evidence of record does not establish that any additional headwater flowing over plaintiff’s land by reason of the cutting down or reduction by the defendant of a section, of the riverside Levee near Birds Point to a grade equivalent to 55 feet on the Cairo gauge will injure, damage, or place upon plaintiff’s timber or land a substantial, burden or servitude to any greater extent than the! timber and land have heretofore suffered, or that the creation of *716 such spillway, through the reduction in height of a portion of the riverside levee, will actually deprive plaintiff of any valuable property rights which he heretofore enjoyed and possessed in the land and timber. The floods in¡ 1912 and 1913 crevassed the riverfront levees at various points and flowed over plaintiff’s land to a depth of from five feet on the highest elevations to twenty feet on the lowest. In 1916 this land was flooded from 1 to 16 feet; in 1920 and 1922 to a depth from zero to 13 feet maximum; and in 1927 when the flood waters of the Mississippi River reached a stage of 58 feet on the Cairo gauge, with the riverside levee then complete to a height of 58 feet and, in some places, to a height of 59 feet on the Cairo gauge, all of plaintiff’s land was covered by flood waters, similar to the overflow in 1912 and 1913, to a depth of from 5 to 20 feet. In January-February 1937 the flood waters of the Mississippi River reached a stage of 59.9 feet on Cairo gauge and before any openings were made by the United States in the upper fuse plug section of the riverside levee under authority of the Flood Control Act of May 15, 1928, the riverside levee of 58 feet on the Cairo gauge was over-topped and crevassed at various places south of Birds Point and below the upper fuse plug section and all of plaintiff’s land was inundated. During the flood of 1937, the riverfront levee was overtopped at several places between Birds Point and plaintiff’s land at a flood stage of 56.80 feet on the Cairo gauge. This overtopping produced crevasses in the riverside levee which is not more than 8 feet in thickness at the top. The flood waters flowed over the riverside levee into the Birds Point-New Madrid Flood-way and over plaintiff’s land. After the riverside levee had crevassed, an agent of the United States created crevasses in the riverside levee at the upper fuse plug section thereof, just south of Birds Point, by dynamiting the same. (Finding 17.) Prior to that time no action had been taken by the United States to reduce the height of the riverside levee at any point, and no time had been definitely fixed for doing so. In these circumstances we think it is clear that the burden or servitude upon plaintiff’s land resulting from flood waters of the Mississippi River, so far as flood *717 waters may affect tlie profitable use by plaintiff of such land, has been as great from natural causes, for which the United States cannot be held responsible, as will result from the reduction of a portion of the riverside levee near Birds Point to a height equivalent to 55 feet on the Cairo gauge. The only possible taking for which the United States could be held liable on any theory would arise from tb,e effect of about one or two feet of flood waters of the Mississippi Biver flowing over the upper fuse plug section of the 58 foot riverside levee when that section is reduced to 55 feet. The existence of such a taking is problematical and conjectural for the reason that experience has shown that an earthen levee of the height of the existing riverside levee between Birds Point and New Madrid will probably break or crevasse when the flood water of the river reaches a stage within two or three feet of the top of the levee. In other words, a levee constructed of earth, in order to afford probable protection to the adjoining property from overflow by flood waters, must have a freeboard of three feet. In order that a riverside levee of the character of the levee between Birds Point and New Madrid may be regarded as affording a complete protection, it must have a freeboard of at least 5 feet. The reason for this is that the top of the riverside levee between Birds Point and New Madrid and levees generally constructed of earth are usually not sufficiently wide or thick at the top to withstand to its entire height the pressure of flood waters and wave-wash, and .when the last few feet of thei levee become saturated with water it is likely to, and experience shows that it does, in many cases, give way with the result that large crevasses occur. If the flood waters of the river remain high for sometime an entire section of the levee may be washed out. The facts here establish that the riverside levee between Birds Point and New Madrid wag not more than 8 feet in thickness at its top and that the fuse plug section of the riverside lévee, if and when reduced to a grade of 55 feet on the Cairo gauge, will be 25 feet in thickness at that elevation. It seems clear, therefore, that there will be no likelihood of any crevassing of the levee at the fuse plug section before the flood waters of *718 the river reach a stage in excess of 55 feet on the Cairo gauge. From this it appears only problematical that plaintiff’s land will actually be subject to overflow by headwaters to any greater degree when the fuse plug section of the riverside levee is maintained by the government at 55 feet on the Cairo gauge than they are, and have been, liable to inundation by backwater and headwater by reason of a crevasse in the existing 58-foot riverside levee. Plaintiff contends however that the government has taken away from him and other property owners the right to build the riverside levee to a greater height in order to protect against the crevassing thereof during flood stages between 55 and 58 feet on the Cairo gauge; that after the creation of the floodway the United States will not maintain the riverside levee between Birds Point and New Madrid at its; present height of 58 feet nor will it repair any crevasses or washouts of the upper and lower fuse plug sections of the riverside levee below 55 feet on the Cairo gauge. The United States had the right, without liability, in the exercise of its lawful authority to control navigation and navigable waters, to fix the height at which the riverside levee might be constructed — namely, at 58 feet, and plaintiff cannot sustain a taking because of this feature of the Flood Control Act nor from the fact, if it were a fact,, that the United States will not maintain or assist in maintaining the riverside levee at its present height of 58 feet. However, section 6 of the Flood Control Act[2] provides for the maintenance of the riverside levee and with respect to thej portion of that levee, other than the fuse plug sections, the Act provides that the Secretary of War may expend funds! appropriated for flood-control purposes for the maintenance of any levee, when, in 1ns opinion, the levee is not or cannot be adequately maintained by the State or Levee District. The Flood Control Act[3] further provides in section 3, that the maintenance expected of the State and levee districts, except the maintenance of the controlling and regulating spillway structures and special relief levees, in- *719 eludes, normally, such matters as cutting grass, removing weeds, local drainage, and minor repairs of main river levees. Under the express provisions of the act the United States assumed the responsibility of maintaining, controlling, and regulating spillway and special relief levees, which include the so-called “fuse plug sections” of the riverside levee. This is a controlling and regulating spillway structure. The construction by the United States of a second or setback levee, so as to confine any flood waters in a specified area, was not alone a taking of any property or property rights. The construction of such levee was clearly in the exercise of a lawful power and any increased costs to plaintiff in the operations of a business or in the exploitation of his timber, or any depreciation in the value of his property because of such anticipated increased costs of carrying on operations over the setback levee are consequential damages for which no recovery can be had under the Fifth Amendment. The United States did not take or intend to take plaintiff’s timber or business, or any property right therein, and the facts do not show that the timber or any property right therein will be damaged or destroyed by any act of the Government. Any increased cost of timber operations must, therefore, be classed as consequential damages for which no recovery can be had under, the Fifth Amendment. Mitchell et al. v. United States, 267 U. S. 341. The President in his message of December 8, 1927, transmitting and recommending the adoption of the Jadwin Plan, and the Congress, in the Act of May 15, 1928, expressly declared the established doctrine of immunity of the United States from liability for consequential damage. In section 3 of the Flood Control Act it was provided that “No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place.”
In the case at bar it clearly appears from the findings and from what has been stated above that the acts of the defendant have not directly and permanently subjected plaintiff’s property to such a burden or servitude as would constitute a taking for which a contract to pay just compensation may be implied. Plaintiff’s property has always been, *720 and was at the time of tbe enactment of the Flood Control Act, subject to overflow and the facts establish that at least 98.8 percent of plaintiff’s land has always been, and still is, completely covered with water to a depth of 18 feet and under when the waters of the Mississippi River attain a stage equivalent to 55 feet on the Cairo gauge. In addition to this, the facts establish that plaintiff’s land has been under the burden and likelihood of being completely overflowed to depths of from 1 to 20 feet or more from crevasses in a 58-foot riverside levee during flood stages in excess of 55 feet on the Cairo gauge.
The well established doctrine of the decisions on the subject of what shall constitute a taking for which just compensation must be paid is that where the Government, in the exercise of its lawful functions for the promotion of some public undertaking, actually invades private property or places thereon some definite and ascertainable burden, not merely of a temporary character, upon the possession, use, or control of property, there is a taking, and a promise to compensate the owner will be implied under the Fifth Amendment. But in order to create an enforceable liability against the Government it is at least necessary that the alleged overflow be the direct result of and wholly attributable to the government structure, and constitute an actual and permanent invasion of the land amounting to an appropriation thereof rather than merely an injury to the property. Sanguinetti v. United States, 264 U. S. 1. Any action on the part of the Government which does not in and of itself encroach upon private property or valuable property rights by depriving the owner of the possession or use of a definitely existing right therein by the placing thereon of a burden or servitude, but which imposes only a temporary, occasional, or incidental injury or impairs the use of such property or property rights is regarded as consequential damages and does not constitute a taking. The act of the Government or the clear intention to take such action must amount to a complete appropriation of a clearly existing property right. Contemplated or prospective encroachments, the direct effect and consequences of which are problematical and conjectural, do not give rise to an en *721 forceable obligation to compensate. Only consummated acts which actually deprive an owner of property or of valuable existing property rights, or acts so definite in character as to show a clear intention to take the property or property rights, or to place thereon such a permanent servitude not theretofore existing as will deprive the owner of the actual or profitable use thereof, can be held the basis of an implied promise to pay. Gibson v. United States, 166 U. S. 269; Bedford v. United States, 192 U. S. 217; Manigault v. Springs, 199 U. S. 473; Peabody v. United States, supra; Portsmouth Harbor Land & Hotel Co. et al. v. United States, supra; Wm. Wrigley, Jr., Company v. United States, 75 C. Cls. 569.
Upon the facts disclosed by the record and under the decisions cited, we are of opinion that there has been no taking by the United States of plaintiff’s property or property rights for which recovery can be had under the Fifth Amendment. The petition is therefore dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; Green, Judge; and Booth, Chief Justice, concur.
(Note. — Plaintiff's motion for new trial withdrawn, December 30, 1938.)

 Sec. 702 (f) U. S. C. A. Title 33, sec. 142, House Document No. 90.

 Sec. 702 (c) U. S. C. A. Title 33, and sec. 147 (c), p. 34, House Document No. 90.