## YAZEL et al. v. UNITED STATES.
### No. 47895.

United States Court of Claims.

Dec. 5, 1950.

James M. Desmond, Washington, D. C., for the plaintiffs. Reed O. Gentry, Clay C. Rogers, Jack B. Robertson, Mosman, Rogers, Bell, Field & Gentry, all of Kansas City, Mo., Roy B. Kelly and Reasoner, Kelly & Davis, all of Washington, D. C., were on the brief.

Walter H. Williams, Washington, D. C., with whom was Asst. Atty. Gen. A. Devitt Vanech, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

The plaintiffs sue to recover the amount of $14,440 representing damages for the loss of certain of their lands and damage to portions thereof alleged to have been the result of the defendant's construction of a levee on the south bank of the Kansas River for the protection of a pipe line intake leading to the Sunflower Ordnance Plant.

The land in question is located in Leavenworth County, State of Kansas, on the north bank of the Kansas River. The course of the river as it approaches plaintiffs' land is almost directly north to a point in the adjoining township where, after making a sharp turn to the east, it flows easterly for approximately one-half mile, then slightly south by east. From the point where the river turns southeast, it flows past the plaintiffs' land. The Union Pacific Railroad follows the north bank of the river in its easterly course until a point slightly beyond the southeasterly turn of the river; it then follows about the same southeastern direction as the river. The land which is the subject of this case lies between the apex formed by the river and the railroad on the west, the eastern boundary of the plaintiffs' land on the east, the river on the south and the railroad right-of-way on the north. The land lying within this area represents two tracts, one of which was purchased by plaintiffs in 1925 and the other in December 1943.

Several miles south of the Kansas River the defendant had, prior to 1943, constructed the Sunflower Ordnance Plant. A portion of the water supply for this plant is obtained from the Kansas River from a pipe line, the intake of which was situated on the south bank of the River approximately one-quarter of a mile downstream from the eastern boundary of plaintiffs' land. When, in June 1943, a flood of the Kansas River was threatened, the defendant built an earth levee on the south side of the river for the protection of its water pipe line and a road leading to the intake structure. Apparently this levee was hastily constructed of natural earthen materials and ran in a westerly direction until it approached the sharp turn of the river, generally following a contour several hundred feet back from the river. As it approached the sharp turn of the river it turned in a southwest direction for a short distance. At the east end of the intake structure a much shorter levee was built, running in a southeasterly direction. The levee, which was in place before the high stages of the 1943 flood here involved, had an elevation at its base of approximately 790 feet above sea level or higher.

Prior to 1943 the plaintiffs' land located near the river was at an elevation of 780 feet. Within a short distance it rose to 785 feet, and the highest elevation between the river and the railroad right-of-way on the north was 786.7 feet. All of the land above the elevation of 785 feet was landward, or north, of the 785-foot contour. At that time, prior to 1943, numerous trees grew on the river bank which followed practically a straight line.

The floods which caused the alleged damage to the plaintiffs' land occurred in the years of 1943, 1944 and 1945, and in each case the height of the crest of the flood was measured at a gauge maintained at the intake structure of the Sunflower Ordnance Plant. At that point the crest of the flood was at an elevation of 791.8 in 1943, 791.6 in 1944 and 791.9 in 1945. Upstream at a point about midway between the east and west boundaries of plaintiffs' land, the elevation of the crest of the flood was 793 feet in 1943, 792.8 feet in 1944, and 793.1

feet in 1945. The river was against the banks of the land at elevation 776 feet or higher for a period of 19 days in 1943, 27 days in 1944 and 42 days in 1945. During the years in question, the levee which the defendant had constructed on the south side of the river was not touched by the flood waters until elevation 790 had been reached. In 1943 plaintiffs' land was under water about 8 days and of that time it was submerged to a depth up to 5 feet for approximately 5 days when there was no water on the levee. In 1944, the land was under water 7 days and submerged to a depth of 5 feet for approximately 5 days when there was no water touching the levee. In 1945 the land was under water about 11 days and was submerged to a depth of 5 feet for 9 days when there was no water touching the levee.

In 1943 the flood was against the levee for about 3½ days, in 1944 and 1945 for 2 or 3 days. At the crest of the flood in 1943 at elevation 793 plaintiffs' land was submerged to a depth of about 7.5 feet, in 1944 at an elevation of 792.8 the land was submerged to a depth of 6.9 feet, and in 1945 at elevation 793.1 it was submerged to a depth of 7.6 feet.

In each of the years in question, had the levee not been in place, the crest of the flood would have been about 5 inches lower, and in 1943 at elevation 792.6 feet the land would have been submerged to a depth of 7.1 feet; in 1944 at elevation 792.4, the land would have been submerged to a depth of 6.9 feet, and in 1945 at elevation 792.7, it would have been submerged to a depth of 7.2 feet.

In each of the three years the velocity of the water over the land during the time that the water was against the levee was about 1 foot per second, and had the levee not been in place during those times the velocity would have been about .04 of a foot less per second.

Prior to 1943, during the flood time, plaintiffs' land was submerged to a depth of 5 feet before any water overflowed the south bank of the river. After the construction of the levee by the defendant, overflow of the south bank occurred only

when the stage of the river was above 790 feet and the plaintiff's land was under 5 feet of water. On the occasion of floods of the magnitude of those of 1943, 1944, and 1945, the amount of flow which was prevented from overflowing the south bank was about 4 percent of the entire discharge of the river.

We turn now to a consideration of the nature of the Kansas River, its course and the nature of its banks. The river itself is an alluvial stream, one of the characteristics of which is erosion of its banks due to its meandering course, sometimes referred to as a sinuous or serpentine flow. The banks of such a stream, having been stable for many years may, after prolonged exposure and saturation due to flood conditions, suddenly collapse. In 1940, a survey made by the Army Engineers disclosed that 40 miles of the 160 miles of the Kansas River were active in various degrees of erosion.

Before the construction of the levee by the defendant there was evidence of erosion and a tendency to cave along the bank of the river just upstream from the plaintiffs' land. As early as 1930 the Union Pacific Railroad recognized that bank protection was necessary immediately above the plaintiffs' land on the bend of the river and installed jetties to prevent cutting of the bank. Plaintiffs, however, did not recognize such an eventuality and did not seek to protect their land as did the Railroad.

The 1943 flood caused part of the total land owned by the plaintiffs after December 1943 to cave into the river. The evidence does not establish the amount of land lost in 1943 or that the loss was from the land then owned by the plaintiffs. The 1944 flood caused 13½ acres to cave into the river and the floods in April–May 1945 caused very little, if any, loss of land. There is no evidence that any caving or loss occurred after 1945.

From 1943 to 1946, the topsoil on approximately 60 acres of the total area owned by the plaintiffs after December 1943 was washed away in varying degrees, although in 1949 the evidence established that the land had the same amount of top-soil as low river-bottom land elsewhere in the area. With proper management the land would grow a crop in those years when the land was not flooded and an ordinary flood would reduce the crop yield at least one-half. The evidence does not establish the amount of the topsoil loss which occurred in 1943 before the plaintiffs owned all the land or how much occurred in 1944 and subsequent years.

According to the evidence, that portion of the land which was lost to the river was of a quality capable of producing an average yield of 40 bushels of corn per acre. This land was worth approximately $100 per acre in 1944 and $153 per acre in 1948, the increase in value reflecting the general rise in the price of all farm lands.

Plaintiffs' contention is that prior to the construction of the levee by the defendant the current of the river during flood stages was in the center of the river and against the south bank, and that there was a flood plain two and one-half miles wide behind the south side of the river over which the waters flowed in flood stages. Plaintiffs further maintain that numerous floods had, by deposit of silt on plaintiffs' land, erected a natural dike or levee along the river bank which was higher than the elevation of their land back of the so-called natural levee. As a consequence of the construction of the levee, plaintiffs say that the flood waters which had formerly flowed over the south bank were directed against their land; and furthermore, that whereas the current of the river had previously been in the center of the river and against the south bank, the presence of the levee forced the current against the north bank destroying the natural levee, and creating an unnatural flood plain. Plaintiffs further maintain that the bank line of their land had been previously stable, but after the construction of the levee many acres were washed away and the topsoil lost, all of which was the result of the construction of the levee.

 Thus we are called upon to decide whether or not there was a taking of the plaintiffs' land by the defendant as a result of the construction of the levee. A re-

view of the evidence which supports our findings of fact, leads us to the conclusion that the levee constructed by the defendant was not the cause of the loss of plaintiffs' land, and consequently that there was no taking of the land for which the defendant is obliged to respond in damages.

As previously stated, the elevation of most of plaintiffs' land prior to 1943 was 785 feet, 5 feet lower than the base of the levee. The levee prevented the overflow of the south bank only when the stage of the river was above 790 feet and plaintiffs' land was already under 5 feet of water. The levee did prevent a comparatively small percentage of water from overflowing the south flood·plain of the river in the floods of 1943, 1944, and 1945 and increased the depth of the flood over plaintiffs' land at their crests by about 5 inches and increased the velocity of the water to a slight degree which was not shown to have caused any damage. At the times of these floods, plaintiffs' land, as has been previously pointed out, would have been under approximately 7 feet of water had the levee not been in existence. We do not find that the plaintiffs' contention with reference to the change in the direction of the river's main current has been sustained by the evidence, but, on the contrary, we find that both before and after the levee was built the direction of the river's main current past the plaintiffs' land was from the right of center to and against the north bank. Furthermore, there is no satisfactory evidence that the levee increased the duration of the floods, nor their frequency.

■ Any liability on the part of the United States for damages or a taking under the Fifth Amendment of the Constitution must be established by a proper showing by the plaintiff that the action of the United States was the cause of the loss. In Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 265, 68 L.Ed. 608, the Government had constructed a canal and when its capacity proved insufficient to carry away flood waters, plaintiff's land along the canal was overflowed. The land would have been overflowed without the canal. The court denied recovery stating:

" * * * in order to create an enforceable liability against the government, it is at least necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property. * * *

"The most that can be said is that there was probably some increased flooding due to the canal and that a greater injury may have resulted than otherwise would have been the case. But this and all other matters aside, the injury was in its nature indirect and consequential, for which no implied obligation on the part of the government can arise."

■ Proof of damage alone does not necessarily prove a taking. Cf. Horstmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171; Southern Pacific Co. v. United States, 58 Ct.Cl. 428, 432, affirmed 266 U.S. 586, 45 S.Ct. 124, 69 L.Ed. 454.

■ The well established doctrine on the subject of what constitutes a taking for which the Government must pay just compensation is set out in Matthews, Trustee v. United States, 87 Ct.Cl. 662, 720-721:

"Only consummated acts which actually deprive an owner of property or of valuable existing property rights, or acts so definite in character as to show a clear intention to take the property or property rights, or to place thereon such a permanent servitude not theretofore existing as will deprive the owner of the actual or profitable use thereof, can be held the basis of an implied promise to pay. Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274; Peabody v. United States, supra [231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351]; Portsmouth Harbor Land & Hotel Co. et al. v. United States, supra [64 Ct.Cl. 572]; Wm. Wrigley, Jr., Company v. United States, 75 Ct.Cl. 569." See also Braeburn Alloy Steel Corporation v. United States, 95 Ct.Cl. 343, 353; Houze Convex Glass Co. v. United States, 81 Ct.Cl. 661, 669.

We conclude from the evidence that flood waters standing upon the plaintiffs' land for long periods of time caused the soil to disintegrate, as soil in that locality is prone to do. The construction of the levee by the defendant had no effect on the normal flow of the river and did not itself cause plaintiffs' land to be flooded. While it is true that there was a slight increase in the current of the flood waters and the depth of the water upon plaintiffs' land at crest stages, those things were not shown to have caused any damage or destruction to plaintiffs' land which otherwise would not have occurred.

Upon the facts disclosed by the record and under the decisions cited, we are of the opinion that there has been no taking by the United States of plaintiffs' property or property rights for which recovery can be had under the Fifth Amendment.

Plaintiffs' petition is therefore dismissed. It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.