that the defendant expressly reserved the right in said agreement, in the circumstances presented in this case, to question the validity of the patents covered by the agreement of June 29, supra, and submit evidence in support of such claim of invalidity. It is the general rule, well established by the decisions of the courts, with respect to patent licenses, that a licensee waives his right to attack validity only in those cases where the right to do so is not expressly reserved. We think it clear that in the circumstances presented by this case the defendant under paragraph thirteen of the license agreement expressly reserved the right to interpose the defense of invalidity of the patents covered by said agreement. No case has been called to our attention, and we have found none, which holds that in circumstances such as are here presented a licensee is precluded from attacking the validity of the patents involved. Title 60 of the Revised Statutes, Act of July 8, 1870, 16 Stat. 200 et seq., relates to Patents, Trademarks, and Copyrights [1952 Revision 35 U.S.C.A. § 101 et seq.] Chapter I of this title relates to patents. Section 4886, as interpreted by the courts from time to time since its enactment, defines an invention upon which a valid patent may issue. Various sections of this chapter contain defensive rights. The right of a defendant in a suit involving the use of an alleged invention covered by a patent, to interpose the defense of invalidity is clearly contained in Sections 4886 and 4888. Paragraph thirteen of the license agreement of June 29, 1943, clearly and specifically reserved to the Government *all rights* set forth in Title 60 of the Revised Statutes.

The plaintiff's first objection to defendant's motion is therefore denied.

With reference to plaintiff's second objection to defendant's motion, we are of opinion that a proper showing has been made by the defendant of newly discovered evidence not available for submission at the time of the trial of the case before the Commissioner, and that in view of the showing made by defendant in its motion for remand for further proof, and the exhibits attached to said motion, the case should be remanded to the Commissioner for the taking of fur-

ther evidence as to the validity of claim 13. See Rule 48 of the rules of this court, 28 U.S.C.A.

For the reasons stated, it is ordered by the court that this case be and the same hereby is remanded and referred to Commissioner Gordon, for the taking of such further proof as may be offered by defendant relating to claim 13 of patent No. 1,942,688, and such rebuttal evidence as may be offered by plaintiff with reference thereto. The case shall not be reopened for further proof by the party as to any other phase or claim with respect to the agreement of June 29, 1943, or the patents covered thereby.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.

**COATES et al. v. UNITED STATES.**

No. 49684.

United States Court of Claims.

March 3, 1953.

See also, 117 Ct.Cl. 795, 93 F.Supp. 637.

B. Sherman Landau, St. Louis, Mo., Louis E. Miller, St. Louis, Mo., on the briefs, for plaintiffs.

Floyd L. France, Washington, D. C., James M. McInerney, Asst. Atty. Gen., Andrew J. Murphy, Jr., Louisiana, Mo., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This is an action to recover just compensation for the taking by the United States of 225.86 acres of farm land adjoining the north or left bank of the Missouri River in St. Charles County, Missouri, in 1947, and for the taking of crops in 1945 and 1947. Plaintiffs, husband and wife, seek $82,040.04 for the destruction of the crops, and $97,500.00 representing the reduction in value of plaintiffs' farm as a result of the alleged taking. The case was previously before us on defendant's demurrer to the petition, which was overruled, 117 Ct.Cl. 795, and is now before us for final determination.

Plaintiffs contend that the acts of defendant (1) increased the water surface elevation of the river at plaintiffs' farm, thereby increasing flood stages, (2) caused an increased velocity in flood waters over plaintiffs' land, thereby causing greater destruction to the land, and (3) that the destruction of the land and crops constitutes a taking within the meaning of the Fifth Amendment to the Constitution.

Defendant denies that its acts had the effect complained of, and contends that its acts were not the direct and necessary cause of the damage to plaintiffs' land and crops. Defendant further contends that assuming, *arguendo,* an increase in the velocity of the river as a result of defendant's acts, plaintiffs have no right to recover, as indirect and consequential damages resulting to a riparian owner from improvements to navigation placed in a navigable [1] stream by the United States do not constitute a taking of private property for a public purpose with an implied promise to pay just compensation under the Fifth Amendment. Defendant also invokes the bar of the statute of limitations, and finally urges that plain-

---

1. The plaintiffs do not agree that the Missouri River is navigable within the meaning of law. The question of whether or not a stream is navigable is a fact which must be proved, Iowa-Wisconsin Bridge Co. v. United States, 84 F.Supp. 852, 114 Ct.Cl. 464, and the proof may consist of evidence that the watercourse in question is either used or susceptible of use in its ordinary condition as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999. We have found as a fact that the Missouri River is navigable.

tiffs are not entitled to recover for a condition existing at the time they purchased their farm.

The land involved in this action is located near Matson, Missouri, and has about 2,400 feet of river frontage on the north or left bank of the Missouri River between Mile 54 and Mile 55, i. e., between 54 and 55 miles upstream from the mouth of the Missouri River where it flows into the Mississippi River.

Plaintiffs acquired the land involved through three purchases. The initial purchase took place in November 1942, when equitable title to a tract of 120 acres was acquired. In January 1943, equitable title to a tract of approximately 39 acres was obtained. At the time of these two purchases, plaintiffs had legal title to the tracts placed in the name of others in order to facilitate the acquisition of subsequent tracts at the best possible prices. Legal title to the two tracts was conveyed to plaintiffs on May 23, 1945, and August 31, 1944, respectively. On June 12, 1945, plaintiffs purchased a tract of about 66 acres, of which 26 acres was bottom land. The evidence does not reveal whether this purchase was prior to or after the flood of June 1945. The three purchases constitute plaintiffs' present farm of 225.86 acres.

The southernmost 89 acres of plaintiffs' farm, adjoining the river, is bottom land; the remainder is hill land. The area where plaintiffs' farm is located lies in the flood plain of the Missouri River. The Missouri River is an alluvial stream, and the soil in Darst Bottoms, including plaintiffs' bottom lands, consists of layers of sand, clay, and silt, which have been deposited by the river over long periods of time. Prior to 1947, most of plaintiffs' bottom land was of a rich and fertile quality. The elevation of this land at the river bank is 468 feet above mean sea level. Prior to 1942, a levee was constructed on plaintiffs' farm by private interests. This levee has an elevation of 470 feet above mean sea level, and it has been overtopped by every major flood since

its construction. The ordinary high water mark on the left bank of the river in the vicinity of plaintiffs' farm is 465 feet above mean sea level.

Since 1890, the main current of the river has been directed against the left bank, both above and below Mile 55. As a result of the cutting action of the current, an extensive portion of what was formerly the left bank of the river has been destroyed. In 1924 the left bank of the river in the vicinity of Mile 55 was more than 7,200 feet north of the line which marked the location of the bank in 1890. Since 1932, however, erosion of the left bank has been substantially prevented as a result of the construction of a revetment. This revetment was constructed partially by local interests and partially by the Corps of Engineers.

Pursuant to authority granted by Congress in the Act of July 25, 1912, 37 Stat. 201, and subsequent acts, the Corps of Engineers carried out a project for improving the navigability of the Missouri River from Kansas City to its confluence with the Mississippi.[2] The means used for improving the navigability of the channel consisted of revetment to fix the banks and a system of permeable dikes to contract, shape, and stabilize the navigation channel. As a part of this program approximately 1,350 permeable dikes were installed in the river between Kansas City and its confluence. A number of such dikes were installed in the river above, below, and across the river from plaintiffs' land. Construction of the dikes in the vicinity of plaintiffs' farm was completed between 1930 and 1936. All of the dikes involved in this action were installed on the opposite side of the river from plaintiffs' farm. They extended out into the river nearly at right angles and varied in length from about 300 feet to a maximum of 2,259 feet.

The dikes consist of timbers about 40 feet long driven into the bed of the river, usually in clumps of two or three. The clumps are tied together with cables, and stringers used between the clumps. After the dikes had

2. The project originally called for a minimum low water depth of six feet and a minimum width of 200 feet, but by the Act of March 2, 1945, 59 Stat. 10, a navigation channel having a minimum low water depth of nine feet and a minimum width of 300 feet was authorized.

been constructed, sand bars formed downstream from each dike. Eventually the dikes became buried and created solid barriers which now constitute a new bank. The length of time ordinarily required for the formation of a sand bar below a dike varies from a few months to 10 years, and the length of time needed for dikes to become fully effective is from 10 to 15 years.

All of the dikes opposite plaintiffs' farm were built below the ordinary high water mark of the river at the point of installation. The elevation of the highest point on any of the dikes was 462.3 feet above mean sea level, 2.7 feet below ordinary high water mark, 5.7 feet below the elevation of plaintiffs' bottom land, and 7.7 feet below the top of the levee protecting the land.

The dikes have been effective in reducing the width of the water surface opposite plaintiffs' land from 2,500 feet to approximately 1,300 feet, but the narrower and deeper channel which the water is forced to occupy has a capacity equal to the untrained channel during ordinary stages.

The area where plaintiffs' farm is located has long been subject to damaging overflow. The greatest flood of record in the vicinity of Darst Bottoms occurred in 1844. The next major flood was in 1903. Thereafter there were a number of small floods, but no serious flood until 1927. What is now plaintiffs' farm was flooded to some extent in 1927, 1928, 1929, and 1939, and was completely submerged by the floods which took place in 1935, 1941, 1942, 1943, 1944, 1945, and 1947.

The period of 1941 to 1947 was one of severe flood damage along the Missouri River, and the most severe floods from the standpoint of height and duration were those of 1945 and 1947. In April and June of each year,[3] flood waters attained an elevation of 470 feet or more in the vicinity of plaintiffs' farm, and the flood of June

1947 reached an elevation of 475.2 feet.

Sand had been deposited on the land in Darst Bottoms by the actions of floods over a long period of time, but the floods of 1943 and subsequent years were accompanied by larger deposits of sand and more extensive erosion of topsoil than ever before. The claim for the taking of land has been limited to the 1947 flood damage, as the two floods of that year were the most destructive that have ever occurred within the memory of persons living in Darst Bottoms.

As a result of these two floods, there was extensive erosion of the topsoil on plaintiffs' bottom land, and all but approximately 30 acres of the 89 acres of bottom land were covered with a deposit of sand ranging in depth from a few inches to about three feet. Approximately 36 acres of this land has been permanently destroyed for agricultural use, and some 24 acres can be put back into production only by special treatment and at considerable expense.

Plaintiffs claim a taking of crops in 1945 and 1947. The method by which damages are sought to be established is set out in finding 21. The evidence regarding the losses of crops is vague and indefinite. It is not sufficient to show what crops were actually growing on plaintiffs' farm at the time of the floods, or the acreage, kind, condition, or value of the crops that were washed away.

Plaintiffs contend that the dikes installed by the defendant (1) directly increased the water surface elevation of the river at plaintiffs' farm, thereby increasing flood stages, and (2) directly caused an increase in the velocity of the flood waters over the land, which resulted in an increase in the damage to plaintiffs' land through erosion and sanding.

■ With respect to their first contention, plaintiffs say that the farm was sub-

---

**3.** The violent nature of the Missouri River, and its annual April and June rises, are well known. See Nebraska v. Iowa, 143 U.S. 359, 368–369, 12 S.Ct. 396, 36 L.Ed. 186, see also Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 675, 51 L.Ed. 956, where the Supreme Court said, at p. 116:

"When the June flood comes down the Missouri river it is a mighty torrent. One can stand on the bluffs at Kansas City and see an enormous volume of water, extending in width from 2 to 5 miles to the bluffs on the other side of the river, flowing onward with tremendous velocity and force; * * *."

merged to a greater extent, and for a longer period of time, than would have been the case had the dikes not been installed. We are unable to agree. Although the evidence is conflicting, it has not been established that the dikes increased the water surface elevation to the extent that the land would not have been flooded had there been no dikes, or that the floods which caused the damage complained of were the direct and necessary result of the dikes. A review of the evidence leads us to the conclusion that the damage to plaintiffs' land and crops as a result of the height and duration of the destructive floods of 1945 and 1947 would have been substantially the same in the absence of the dikes installed by defendant.

When this case was before us on defendant's demurrer, 93 F.Supp. 637, 639, 117 Ct.Cl. 795, at p. 798, we said:

"* * * if it can be shown that the activities of the defendant directly and necessarily resulted in the alleged permanent destruction of the plaintiffs' land, then plaintiff would be entitled to recover for an invasion of a permanent and continuous character constituting a taking of private property for a public purpose for which there is an implied promise to pay just compensation as required by the Fifth Amendment (citing cases)."

As stated above, plaintiffs have not been able to establish that the land would not have been flooded had there been no dikes, or that the floods which caused the damage complained of were the direct and necessary result of the dikes. It is clear, at least to the extent that the floods would have destroyed the land and crops of plaintiffs in the absence of the dikes, that there has been no taking of plaintiffs' property. Any liability on the part of the United States for a taking under the Fifth Amendment to the Constitution must be established by a proper showing that the action of the United States was the cause of the loss. Yazel v. United States, 93 F.Supp. 1000, 118 Ct.Cl. 59.

Plaintiffs next contend that the dikes directly caused an increase in the velocity of flood waters over plaintiffs' farm, which resulted in an increase in the damage to the farm during flood stages, through additional erosion and sanding. This, plaintiffs say, constitutes a taking within the meaning of the constitutional provision. Defendant contends that the dikes resulted in an increase in velocity only when the water surface elevation of the river was below the top of the dikes, and not at flood stages. Defendant further contends that the evidence does not disclose what portion of the damage, if any, to plaintiffs' land was caused by the increase in velocity, and finally urges that damages of the nature here involved, if proven, do not constitute a taking under the Fifth Amendment.

We have found that as a result of the installation of the dikes on the right bank of the river, the velocity of the river in the vicinity of plaintiffs' farm was increased by approximately 10 percent. It might be reasonable to assume that this increase in velocity caused more erosion and sanding of plaintiffs' land than would have occurred had the dikes not been constructed, but if true, the extent to which the damage caused by the floods was increased by the dikes cannot be determined from the evidence.

Although we are not convinced that damages of the nature sought by plaintiffs constitute a taking if proven, we need not here decide that issue, for plaintiffs have not been able to establish that the increase in the velocity of the river caused any measurable damage to or destruction of their land which would not otherwise have occurred. Any finding as to what portion of the damage suffered from erosion and sanding was attributable solely to the presence of the dikes in the river would, on the evidence before us, be highly speculative and conjectural. We cannot engage in such speculation, as there must be some foundation for the judgment rendered. Addison Miller, Inc. v. United States, 70 F.Supp. 893, 108 Ct.Cl. 513, 557.

We accordingly hold that under the evidence in this case, plaintiffs are not entitled to recover. See Yazel v. United States, supra.

The conclusion we have reached makes it unnecessary to consider the remaining

476

issues raised by the parties. Plaintiffs' petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

**PALACE CORP. v. UNITED STATES.**
No. 49471.

United States Court of Claims.
March 3, 1953.

Leon Morris Shinberg, Washington, D. C., for plaintiff. Leo Fixler, New York City, was on the brief.

Frank J. Keating, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

This case involves five different claims growing out of two contracts. One of the contracts called for the transportation, erection, and installation of 1,234 Palace Mobile Expansible houses for the housing project at Akron, Ohio. The other contract called for the manufacture of these houses.

Count I alleges a wrongful withholding of $32,504.26 of the contract price. This