under Article 33 of the contract, for an adjustment in the unit price of the completed fuses manufactured under the unterminated portion of the contract.

■ We think the plaintiff's claim was a termination claim. As shown in our earlier findings and opinion, 113 F. Supp. 446, 126 Ct.Cl. 100, there was a formal termination; the plaintiff filed a claim; the Government asserted that the form which the plaintiff had signed in connection with the termination was a waiver of a right to file a termination claim; we held that it was not such a waiver and determined that the Government was liable on the claim. The plaintiff's petition was based upon a termination claim. From Government writing and from the testimony of a Government expert it appears that the claim was a termination claim. The Government's Appeals Board held that the only kind of claim available to the plaintiff was a termination claim. In our prior decision we said that the plaintiff was entitled to the benefits of the Article 12(f) of the contract.

All of Article 12 relates to "Termination at the option of the Government". Section (f), in particular, of Article 12, relates to the adjustment of the price of work not terminated in an otherwise terminated contract. We held that the Board of Contract Appeals could have made such an adjustment. If it had done so, with reference to the 54,250 fuses which had not been terminated, that would have reduced, by the amount of the adjustment, the amount of the plaintiff's claim for starting costs, etc., on the terminated portion of its contract. But no such adjustment was made, hence all of the claim continued to be included in the termination claim.

The Government points to testimony of a witness for the plaintiff, and statements of plaintiff's counsel, to show that they were claiming the benefits of Article 33 of the contract, which related to price revision without termination. The Government persistently and probably rightly insisted that Article 33 was not applicable, in the circumstances. We think the substance of the plaintiff's claim was not changed by these casual departures from the proper theory of the case.

■ The Government urges that since Article 12, the termination agreement of the parties, made no mention of interest, interest may not be recovered. We think the interest provision of the statute is mandatory, at least to the extent that it is not negatived by mere silence.

The plaintiff may have a judgment for $166,911.33, with interest at 2½ percent from March 24, 1945.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER, and LITTLETON, Judges, concur.

Dewey J. CRITES, Jack Mayta, and James Willette

v.

The UNITED STATES.

Congressional No. 8–52.

United States Court of Claims.

July 12, 1955.

John McSherry, Jr., Cle Elum, Wash., for plaintiffs.

Walter H. Williams, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is a Congressional Reference case referred to the court by H. Res. 709, 82nd Congress, 2nd Session, under which the court was to proceed in accordance with 28 U.S.C. sections 1492 and 2509 and report to the Congress respecting the claims of the plaintiffs against the United States as the result of alleged damage to their farms from the control of the Yakima River for irrigation purposes by the Bureau of Reclamation of the Department of Interior.[1]

The Yakima Project which was begun in 1911 is situated in south central Washington. It is divided into several irrigating divisions and a storage division consisting of six reservoirs, three of which are situated above plaintiffs' lands. Their lands which are located approximately four miles downstream from the city of Cle Elum, Washington, were acquired in the years 1939 and 1944, and have been utilized by them for dairying, farming and pasturage purposes. Findings 2–4. For a description of the lands in relation to the river see findings 5–7.

The function of the reservoirs is to store floodwaters in the fall, spring and winter for release during periods of low flow when irrigation is necessary. While the principal purpose of the reservoirs is to store water for irrigation, they are also used as far as possible for flood control. The operation of the reservoirs (and it is the three that are situated above plaintiffs' lands with which we are concerned), while lessening the adverse effects of the spring and winter floods on plaintiffs' lands has had the effect of passing more water down the river and channels adjacent to and cutting through their properties during the late spring, summer and early fall.

This, plaintiffs allege, has resulted in the impairment of the usefulness of their lands during the normal farming season with the resultant decrease in the value of their properties. While not questioning the overall purposes and benefits of the irrigation project, plaintiffs do contend that insofar as the project has resulted in a taking or injuring

1. As to plaintiffs Dewey J. Crites and James Willette, the lands in question are held in the names of their wives as well, although their names were omitted in both the bill (H.R.1918) and the resolution referring the matter to this court. Findings 1–3.

of their lands the Government should compensate them.

Defendant's position is that plaintiffs have neither a legal nor equitable right to recover because the evidence has failed to establish that their lands have been taken or injured as a result of the operation of the irrigation project or that the facts warrant consideration of the claims on an equitable basis.

While defendant has made use of the Yakima River for irrigation purposes for many years, plaintiffs' position is that the present conditions, of which they first complained in 1947, have resulted to a great extent from the addition of the Roza Irrigation Division in 1941. In this division additional land has been put under irrigation each succeeding year with 40,000 acres included by 1945, and 69,000 by 1953.

The Yakima River is a meandering, alluvial stream. Its bed of sand and gravel is unstable and the channel is unstable. The banks are sand and gravel mixed with silt and clay. Major changes in the bed and course of the river occur during periods of very high flow resulting from either winter or spring floods. At those times the bed may be cut down or built up. The water cuts the bank on the outside of bends, and side channels are cut across the bends. That this result would be prevalent on plaintiffs' lands can be seen from the fact that the course of the river through and around those lands forms a typical oxbow. The land of plaintiff Willette is in fact not touched by the main channel of the river but his use of the land is affected by the presence of water in the main overflow channel and side channels which cross his land, as well as that of the other plaintiffs. Present indications are that this main overflow channel which cuts across the oxbow will in time be the main channel of the river.

Aggradation of the river bed in the vicinity of plaintiffs' lands which has been taking place for many years, although at varying degrees from year to year, has also influenced the course of the river and the flow of water. Cycles of aggradation and degradation are normal for an alluvial stream like the Yakima. In addition to this normal process, aggradation of the bed near the lands in question has resulted from a slide one mile below those lands in 1947, which blocked the river for a short time with the new channel that was cut being narrower and its bed higher than the former channel. Aggradation also resulted from the straightening of a curve in the railroad above Cle Elum which increased the slope of the river, causing the gravel in the bed to move downstream. The 1948 flood, which was the greatest in many years, resulted in a great deal of aggradation.

The cutting of the overflow channels across the lands and the aggradation of the bed of the river have lessened the usefulness of plaintiffs' lands. Certain of the areas do not drain off as they formerly did with the result that acreage that was capable of growing hay is now usable only for pasturage. In addition the presence of more water in the side channels during the summer months has made certain areas less accessible, insofar as their use for pasturage is concerned.

It is plaintiffs' contention that these conditions have been caused or aggravated because of the Bureau's action since 1947 of passing greater volumes of water past their lands during the summer months. Readings at a stream-gaging station maintained by the Government just below Cle Elum do show that, on an average, a greater volume of water has passed plaintiffs' lands during the 1947–52 period of July, August, and September in comparison with the previous six year periods of 1935–40 and 1941–46. Findings 13 and 16.

Despite this it remains impossible when considered in the light of the nature of the Yakima River to find that this increased flow, even if wholly chargeable to the Government, has been an appropriation of plaintiffs' lands to the extent of constituting a taking which

is compensable under the Fifth Amendment. Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608, affirming 55 Ct.Cl. 107; Coates v. United States, 110 F.Supp. 471, 124 Ct.Cl. 806; Yazel v. United States, 93 F.Supp. 1000, 118 Ct.Cl. 59; Matthews v. United States, 87 Ct.Cl. 662; Vansant v. United States, 75 Ct.Cl. 562. Failing this, plaintiffs' remedy, if any, against the Government would be one in tort over which this court has no original jurisdiction.[2]

Then too, the record before us fails to disclose any discernible decline in the value of the plaintiffs' lands since 1947, and plaintiffs' evidence in support of their allegations of loss of income on the properties is insufficient.[3] Finding 26.

Four qualified witnesses, two by each party, were presented on the question of the value of the lands. Plaintiffs' witnesses evaluated the lands by comparing them with other lands in the general area which were not subject to the flooding conditions, i. e., land which could be tilled and farmed minus the water conditions found on plaintiffs' lands. This, of course, assumed a premise which has never existed insofar as the lands in question are concerned. It served to give a would-be value of $23,250 on the Crites land, yet he paid only $5,000 for it in 1944. All witnesses fixed this same figure, $5,000, as the present value of that land. The 1953 value of the lands and improvements thereon are set forth in finding 26.

All the river bottom lands along the Yakima River of which plaintiffs' lands are an example do not have a wide market and their value does not tend to change or fluctuate to any degree. The use of the land and its marketability is limited because of the perennial danger of floods with the resultant cycles of aggradation and degradation and the cutting of side channels because of the winding course of the river. These limitations have existed for many years and there has been no showing that they are now greater than could have been expected at the time plaintiffs acquired the lands.

Conclusion

We find no legal or equitable liability. Although the usefulness of plaintiffs' lands has been impaired to some extent because of the action of the river, we are unable on the basis of the record before us to find the Government responsible or to find that there has been a material decrease in the value of the lands in question since 1947. Any payment which the Congress in the exercise of its discretion may grant on the basis of the findings of fact herewith would be in the nature of a gratuity.

This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to House Resolution 709, 82nd Congress, 2nd Session.

JONES, Chief Judge, and LARAMORE, MADDEN, and WHITAKER, Judges, concur.

2. Any action by plaintiffs in the District Court under the Federal Tort Claims Act, 28 U.S.C., 1952 ed., sections 1346, 2671–2678, 2680, would be barred by the "discretionary function or duty" exemption of that Act. The regulation of water flow by the Bureau of Reclamation in the operation of an irrigation project of the type we have here would seem to come within that exemption. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427; Coates v. United States, 8 Cir., 181 F.2d 816, 19 A.L.R.2d 840.

3. This evidence consisted of plaintiffs' own recollections and estimates of alleged losses with no distinction between those caused by floods and those chargeable to other causes.