**L. A. ANDERSON et al.**

v.

**UNITED STATES.**

No. 441–56.

United States Court of Claims.
July 15, 1959.

946

Mack V. Traynor, Devils Lake, N. D., for plaintiffs. John T. Traynor, Francis E. Foughty and Ralph J. Erickstad, Devils Lake, N. D., were on the brief.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

MARIS, Circuit Judge (sitting by designation).

By a Special Act, the Congress conferred jurisdiction upon this court to hear, determine, and render judgment upon the claims of 22 groups of plaintiffs as to the legal or equitable liability of the United States for losses allegedly sustained by reason of the flooding of their lands in the vicinity of Lake Alice, North Dakota, as a result of the activities of the Fish and Wildlife Service in connection with the establishment of certain migratory wildlife refuges. The plaintiffs, who are owners and farm operators of the land here involved, or tenant farmers on a share-cropping basis, claim that certain structures built by the Fish and Wildlife Service caused their lands to be flooded during various years between 1940 and 1956 for which they seek compensation in the amount of approximately $835,000. The United States, on the other hand, disclaims any responsibility for the flooding of the plaintiffs' lands.

■■ It is a generally accepted rule that one cannot lawfully divert water from its natural watershed or by artificial structures cause water to flow in another direction or over lands upon which it would not otherwise have gone if to do so will deprive a landowner of the use or the fruits of his property. Pumpelly v. Green Bay Company, 1871, 13 Wall. 166, 181, 80 U.S. 166, 181, 20 L.Ed. 557; United States v. Cress, 1917, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746; Soules v. Northern Pac. Ry. Co., 1916, 34 N.D. 7, 157 N.W. 823, L.R.A.1917A, 501; Reichert v. Northern Pac. Ry. Co., 1918, 39 N.D. 114, 167 N.W. 127; Ferderer v. Northern Pac. Ry. Co., 1950, 77 N.D. 169, 42 N.W.2d 216. See also Burkhardt v. United States, 1949, 84 F.Supp. 553, 113 Ct.Cl. 658; Fonalledas v. United States, 1952, 107 F.Supp. 1019, 123 Ct.Cl. 483. But it is necessary to prove that any damage suffered from such action was the direct result of the activities complained

of and there is no liability for damages caused by flooding where it appears that the flooding would have occurred anyway. Yazel v. United States, 1950, 93 F.Supp. 1000, 118 Ct.Cl. 59, 71–73; Coates v. United States, 1953, 110 F. Supp. 471, 124 Ct.Cl. 806, 811–813; Crites v. United States, 1955, 132 F. Supp. 469, 132 Ct.Cl. 544. See also Sanguinetti v. United States, 1924, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608. Therefore, any legal or equitable liability on the part of the United States in this case must be established by a proper showing by the plaintiffs that the activities of the Fish and Wildlife Service in connection with the establishment of the refuges were the cause of plaintiffs' losses.

The tracts of land which are the subject of this case are situated in North Dakota in the vicinity of Lake Alice (or Lac Aux Mortes) and Lake Irvine. Severe drought conditions existed in North Dakota during the 1930's as a result of which Lake Alice and Lake Irvine and the others lakes in the Mauvais Coulee area north of Devils Lake became dry, or practically so. In 1935 and 1936 the Fish and Wildlife Service established the Lac Aux Mortes (Lake Alice) National Wildlife Refuge. Numerous flooding easements were acquired by the United States around the shoreline of Lake Alice. Between 1935 and 1938 the Fish and Wildlife Service established five easement refuges in the Mauvais Coulee area for the protection and preservation of migratory waterfowl. These refuges were established at Rock Lake, Brumba Lake, Snyder Lake, Lake Alice and Silver Lake. Dams, dikes and ditches were constructed to divert natural water courses and drainage areas in order to restore water in these dry or nearly dry lakes for the purpose of creating the migratory waterfowl refuges.

The years here involved are from 1940 to 1956. The spring runoffs were not as severe in the years 1940 through 1947 and in 1952 and 1953 as in the years 1948 through 1951, and in 1955 and 1956. The evidence does not establish that the plaintiffs suffered floodings in 1940, 1941, 1943, 1944, 1952 and 1953. Floodings occurred in varying degrees in the years 1942, 1945 through 1951, and 1954 through 1956. The amount of water which drained into the Lake Alice-Lake Irvine-Chain Lake area in some years exceeded the reservoir capacities of the lakes and the capacity of the outlet of Lake Irvine, the lower of these lakes, to discharge. Because these lands were low, in comparison with the surrounding countryside, and had poor drainage, the water stood for substantial periods of time until it was too late to plant crops. In 1954 the flooding was not due to spring runoff but followed heavy rainfall in May and June 1954 after the farmers had put their lands into crop and the growing crops were destroyed.

Pressure for relief had mounted among the farmers. The Fish and Wildlife Service, in cooperation with the North Dakota State Conservation Commission, had by January 1955 breached or removed all of the refuge structures. Despite the breaching or removal of these structures, the flooding of the low lands occurred again in 1956. The snowfall in the winter preceding the 1956 runoff was the second heaviest during the period of years involved, being exceeded only by the snowfall in the winter preceding the flooding in 1950. No flooding of lands occurred during 1957 up to late in July 1957.

The plaintiffs say that the floodings were caused by the structures built by the Fish and Wildlife Service. The United States, however, argues that these structures did not cause, affect, or contribute to the flooding but that there were other reasons for the flooding; among them, the nature of the lands themselves, their location adjacent to shallow lakes and their low elevation compared to the surrounding countryside, the extremely poor and sluggish drainage throughout the Devils Lake Basin, the excessive rainfall and the heavy spring runoff following abnormal snowfall during some winters, the vast amount of drainage, the silting and clogging of Mauvais Coulee and the small, narrow

and shallow outlet from Lake Irvine through which all the drainage had to pass. We think that the record amply supports the position of the United States.

Plaintiffs' land suffered from flooding long before any structures were built by the Fish and Wildlife Service. Since the first official survey by the General Land Office in 1883 these lands. have had a history of intermittent and periodic flooding during wet years. The field notes of the original survey, which was made in 1883, cover the area where most of plaintiffs' lands are located. The surveyor found that large areas of land adjacent to Lake Alice and Lake Irvine were covered with water in July 1883 and he designated them as wet meadow or marshlands. They are shown as such on the official maps of the General Land Office which were prepared by the surveyor in 1883. In fact, the lands were so flooded at the time of the survey that the surveyor was unable to establish true corners for most of the section lines and had to use witness corners to mark their location. The field notes of the surveyor also indicate that in July 1883 the water in Mauvais Coulee north of Lake Alice was 2 feet deep and "sluggish" and that this water was flooding extensive areas adjacent to Lake Alice and Lake Irvine to depths of 2 or 3 feet. The surveyor returned to the area in September 1883 and his field notes made at that time show that there still were 2 or 3 feet of water on lands south of Lake Alice and east of Lake Irvine. All the lands which are the subject matter of this case were designated as marshes and meadowland on the official maps in the General Land Office.

And in 1956, after the constructions here complained of had been removed, a winter of heavy snowfall followed and the lands were again flooded. Aerial photographs taken in June 1956 by the United States Air Force for the Corps of Engineers in connection with flood control studies covering the entire Devils Lake Basin, including the Lake Alice-Lake Irvine area, show a definite correlation between the marsh and meadowland areas indicated on the General Land Office survey maps of 1883 and described in the surveyor's final field notes, and the areas flooded in 1956. A composite of the aerial photographs taken in 1956 superimposed on the General Land Office survey maps of 1883 show a striking similarity between the areas flooded in 1883 and 1956, which in many instances were identical.

The plaintiffs, however, contend that from the time of the 1883 survey improvements of the drainage were made by the settlers and farmers in the area and there was distinct improvement in the drainage from the Lake Alice-Lake Irvine area as early as 1905 or 1906 and in the 1920's. On the other hand, the United States points out that the farmers constructed dikes, dams and earthplugs for the purpose of preventing particular areas from being flooded and that these structures acted as barriers to the flow of water and caused it to remain on lands from which it normally would have drained off. We do not find support for either contention. While it is beyond dispute that any structures which would interfere with the runoff from the Lake Alice area or which would take away from the area storage capacity on the lake would have an effect on the area, it appears beyond doubt that the crux of the problem was the sudden collection of water and the lack of efficient drainage to enable it to run off promptly. In some years the flooding was more limited than in others but this appears to be the result of climatic conditions rather than any structures built by the farmers or the Fish and Wildlife Service. Whatever improvements were made by the local residents did not remedy the condition for the floodings continued in the years 1906, 1908, 1915, 1919, during the early 1920s to 1925 and in 1933.

Moreover, we think it is significant that the North Dakota State Water Conservation Commission in its Ninth and Tenth Biennial Reports, excerpts from which appear in our findings of fact,

did not suggest that the floodings resulted from the activities of the Fish and Wildlife Service but on the contrary attributed the flood condition to the heavy rains and spring runoff into the vicinity of Mauvais Coulee which was not being relieved quickly enough due to poor drainage from Lake Irvine. Another factor was that during the 1930 drought period the stream bed of Mauvais Coulee between Lake Irvine and Devils Lake became partially filled with drift material which resulted in greatly reducing the capacity of the stream.

The plaintiffs say that the Fish and Wildlife Service failed in its duty, through its easements, in clearing this streambed of the drift material and thus relieving the drainage problem. But the record does not show that the Fish and Wildlife Service knew or was informed by the plaintiffs of this condition. It was reported in the Ninth Biennial Report of the North Dakota State Water Commission for the period July 1, 1952, to June 30, 1954. It appears that the farmers affected by the floods contacted the Commission in respect to methods of correcting the flood condition. Steps were then taken to interest other government agencies in constructing flood protection work and watershed improvement facilities. The Fish and Wildlife Service participated with the Commission in the "blowing out" of a channel between Lake Alice and Lake Irvine in which both agencies shared in the costs. But this clearing of the channel did not relieve the situation. The Chain Lakes Water Conservation and Flood Control District, which was organized in the Spring of 1955 for the purpose of alleviating flooding of lands in the Lake Alice-Lake Irvine area, asked for a 40 foot channel from the outlet of Lake Irvine which, it was estimated, would provide only partial flood relief for this area. And, shortly thereafter, all structures built by the Fish and Wildlife Service were breached or removed but due to heavy spring runoff in 1956 the area was again flooded.

We conclude that plaintiffs' lands were damaged by reason of adverse weather conditions, the topography of the area, and the inadequate outlet of Lake Irvine, but not as a result of the activities of the Fish and Wildlife Service in connection with the establishment and maintenance of the migratory refuges. We, accordingly, conclude that the plaintiffs are neither legally nor equitably entitled to recover. The plaintiffs' petition will, therefore, be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.