Maris, Circuit Judge,
sitting by designation, delivered the opinion of the court:
By a Special Act, the Congress conferred jurisdiction upon this court to hear, determine, and render judgment upon the claims of 22 groups of plaintiffs as to the legal or equitable liability of the United States for losses allegedly sustained by reason of the flooding of their lands in the vicinity of Lake Alice, North Dakota, as a result of the activities of the Fish and Wildlife Service in connection with the establishment of certain migratory wildlife refuges. The plaintiffs, who are owners and farm operators of the land here involved, or tenant farmers on a share-cropping basis, claim that certain structures built by the Fish and Wildlife Service caused their lands to be flooded during various years between 1940 and 1956 for which they seek compensation in the amount of approximately $835,000. The United States, on the other hand, disclaims any responsibility for the flooding of the plaintiffs’ lands.
It is a generally accepted rule that one cannot lawfully divert water from its natural watershed or by artificial structures cause water to flow in another direction or over lands upon which it would not otherwise have gone if to do so will deprive a landowner of the use or the fruits of his property. Pumpelly v. Green Bay Company, 1871, 80 U.S. 166, 181; United States v. Cress, 1917, 243 U.S. 316; Soules v. *693 Northern Pac. Ry. Co., 1916, 34 N.D. 7, 157 N.W. 823; Reichert v. Northern Pac. Ry. Co., 1918, 39 N.D. 114, 167 N.W. 127; Ferderer v. Northern Pac. Ry. Co. 1950, 77 N.D. 169, 42 N.W. 2d 216. See also Burkhardt v. United States, 1949, 113 C. Cls. 658 ; Fonalledas v. United States, 1952, 123 C. Cls. 483. But it is necessary to prove that any damage suffered from such action was the direct result of the activities complained of and there is no liability for damages caused by flooding where it appears that the flooding would have occurred anyway. Yazel v. United States, 1950, 118 C. Cls. 59, 71-73; Coates v. United States, 1953, 124 C. Cls. 806, 811-813; Crites v. United States, 1955, 132 C. Cls. 544. See also Sanguinetti v. United States, 1924, 264 U.S. 146. Therefore, any legal or equitable liability on the part of the United States in this case must be established by a proper showing by the plaintiffs that the activities of the Fish and Wildlife Service in connection with the establishment of the refuges were the cause of plaintiffs’ losses.
The tracts of land which are the subject of this case are situated in North Dakota in the vicinity of Lake Alice (or Lac Aux Mortes) and Lake Irvine. Severe drought conditions existed in North Dakota during the 1930’s as a result of which Lake Alice and Lake Irvine and the other lakes in the Mauvais Coulee area north of Devils Lake became dry, or practically so. In 1935 and 1936 the Fish and Wildlife Service established the Lac Aux Mortes (Lake Alice) National Wildlife Befuge. Numerous flooding easements were acquired by the United States around the shoreline of Lake Alice. Between 1935 and 1938 the Fish and Wildlife Service established five easement refuges in the Mauvais Coulee area for the protection and preservation of migratory waterfowl. These refuges were established at Bock Lake, Brumba Lake, Snyder Lake, Lake Alice and Silver Lake. Dams, dikes and ditches were constructed to divert natural water courses and drainage areas in order to restore water in these dry or nearly dry lakes for the purpose of creating the migratory waterfowl refuges.
The years here involved are from 1940 to 1956. The spring runoffs were not as severe in the years 1940 through 1947 and in 1952 and 1953 as in the years 1948 through 1951, and *694 in 1955 and 1956. The evidence does not establish that the plaintiffs suffered floodings in 1940, 1941, 1948, 1944, 1952 and 1953. Floodings occurred in varying degrees in the years 1942, 1945 through 1951, and 1954 through 1956. The amount of water which drained into the Lake Alice-Lake Irvine-Chain Lake area in some years exceeded the reservoir capacities of the lakes and the capacity of the outlet of Lake Irvine, the lower of these lakes, to discharge. Because these lands were low, in comparison with the surrounding countryside, and had poor drainage, the water stood for substantial periods of time until it was too late to plant crops. In 1954 the flooding was not due to spring runoff but followed heavy rainfall in May and June 1954 after the farmers had put their lands into crop and the growing crops were destroyed.
Pressure for relief had mounted among the farmers. The Fish and Wildlife Service, in cooperation with the North Dakota State Conservation Commission, had by January 1955 breached or removed all of the refuge structures. Despite the breaching or removal of these structures, the flooding of the low lands occurred again in 1956. The snowfall in the winter preceding the 1956 runoff was the second heaviest during the period of years involved, being exceeded only by the snowfall in the winter preceding the flooding in 1950. No flooding of lands occurred during 1957 up to late in July 1957.
The plaintiffs say that the floodings were caused by the structures built by the Fish and Wildlife Service. The United States, however, argues that these structures did not cause, affect, or contribute to the flooding but that there were other reasons for the flooding; among them, the nature of the lands themselves, their location adjacent to shallow lakes and their low elevation compared to the surrounding countryside, the extremely poor and sluggish drainage throughout the Devils Lake Basin, the excessive rainfall and the heavy spring runoff following abnormal snowfall during some winters, the vast amount of drainage, the silting and clogging of Mauvais Coulee and the small, narrow and shallow outlet from Lake Irvine through which all the drainage had to pass. We think that the record amply supports the position of the United States.
*695 Plaintiffs’ lands suffered from flooding long before any structures were built by the Fish and Wildlife Service. Since the first official survey by the General Land Office in 1883 these lands have had a history of intermittent and periodic flooding during wet years. The field notes of the original survey, which was made in 1883, cover the area where most of plaintiffs’ lands are located. The surveyor found that large areas of land adjacent to Lake Alice and Lake Irvine were covered with water in July 1883 and he designated them as wet meadow or marshlands. They are shown as such on the official maps of the General Land Office which were prepared by the surveyor in 1883. In fact, the lands were so flooded at the time of the survey that the surveyor was unable to establish true corners for most of the section lines and had to use witness corners to mark their location. The field notes of the surveyor also indicate that in July 1883 the water in Mauvais Coulee north of Lake Alice was 2 feet deep and “sluggish” and that this water was flooding extensive areas adjacent to Lake Alice and Lake Irvine to depths of 2 or 3 feet. The surveyor returned to the area in September 1883 and his field notes made at that time show that there still were 2 or 3 feet of water on lands south of Lake Alice and east of Lake Irvine. All the lands which are the subject matter of this case were designated as marshes and meadowland on the official maps in the General Land Office.
And in 1956, after the constructions here complained of had been removed, a winter of heavy snowfall followed and the lands were again flooded. Aerial photographs taken in June 1956 by the United States Air Force for the Corps of Engineers in connection with flood control studies covering the entire Devils Lake Basin, including the Lake Alice-Lake Irvine area, show a definite correlation between the marsh and meadowland areas indicated on the General Land Office survey maps of 1883 and described in the surveyor’s final field notes, and the areas flooded in 1956. A composite of the aerial photographs taken in 1956 superimposed on the General Land Office survey maps of 1883 show a striking similarity between the areas flooded in 1883 and 1956, which in many instances were identical.
*696 The plaintiffs, however, contend that from the time of the 1883 survey improvements of the drainage were made by the settlers and farmers in the area and there was distinct improvement in the drainage from the Lake Alice-Lake Irvine area as early as 1905 or 1906 and in the 1920’s. On the other hand, the United States points out that the farmers constructed dikes, dams and earthplugs for the purpose of preventing particular areas from being flooded and that these structures acted as barriers to the flow of water and caused it to remain on lands from which it normally would have drained off. We do not find support for either contention. While it is beyond dispute that any structures which would interfere with the runoff from the Lake Alice area or which would take away from the area storage capacity on the lake would have an effect on the area, it appears beyond doubt that the crux of the problem was the sudden collection of water and the lack of efficient drainage to enable it to run off promptly. In some years the flooding was more limited than in others but this appears to be the result of climatic conditions rather than any structures built by the farmers or the Fish and Wildlife Service. Whatever improvements were made by the local residents did not remedy the condition for the floodings continued in the years 1906, 1908, 1915, 1919, during the early 1920s to 1925 and in 1933.
Moreover, we think it is significant that the North Dakota State Water Conservation Commission in its Ninth and Tenth Biennial Eeports, excerpts from which appear in our findings of fact, did not suggest that the floodings resulted from the activities of the Fish and Wildlife Service but on the contrary attributed the flood condition to the heavy rains and spring runoff into the vicinity of Mauvais Coulee which was not being relieved quickly enough due to poor drainage from Lake Irvine. Another factor was that during the 1930 drought period the stream bed of Mauvais Coulee between Lake Irvine and Devils Lake became partially filled with drift material which resulted in greatly reducing the capacity of the stream.
The plaintiffs say that the Fish and Wildlife Service failed in its duty, through its easements, in clearing this streambed of the drift material and thus relieving the drain *697 age problem. But the record does not show that the Fish and Wildlife Service knew or was informed by the plaintiffs of this condition. It was reported in the Ninth Biennial Report of the North Dakota State Water Commission for the period July 1, 1952, to June 30, 1954. It appears that the farmers affected by the floods contacted the Commission in respect to methods of correcting the flood condition. Steps were then taken to interest other government agencies in constructing flood protection work and watershed improvement facilities. The Fish and Wildlife Service participated with the Commission in the “blowing out” of a channel between Lake Alice and Lake Irvine in which both agencies shared in the costs. But this clearing of the channel' did not relieve the situation. The Chain Lakes Water Conservation and Flood Control District, which was organized in the Spring of 1955 for the purpose of alleviating flooding of lands in the Lake Alice-Lake Irvine area, asked for a 40 foot channel from the outlet of Lake Irvine which, it was estimated, would provide only partial flood relief for this area. And, shortly thereafter, all structures built by the Fish and Wildlife Service were breached or removed but due to heavy spring runoff in 1956 the area was again flooded.
We conclude that plaintiffs’ lands were damaged by reason of adverse weather conditions, the topography of the area, and the inadequate outlet of Lake Irvine, but not as a result of the activities of the Fish and Wildlife Service in connection with the establishment and maintenance of the migratory refuges. We, accordingly, conclude that the plaintiffs are neither legally nor equitably entitled to recover. The plaintiffs’ petition will, therefore, be dismissed.
It is so ordered.
Laeamore, Judge; Madden, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs of the parties, makes findings of fact as follows:
*698 1. The petition in this case was filed on October 12, 1956, pursuant to the provisions of a special jurisdictional act, to recover alleged damages of approximately $835,000, representing losses allegedly sustained by the plaintiffs from the flooding of their lands in the vicinity of Lake Alice, North Dakota, as a result of certain activities of the Fish and Wildlife Service in the establishment and maintenance of migratory wildlife refuges. The special jurisdictional act, Private Law 718, 84th Cong., 2d Sess., 70 Stat. A95, entitled “An Act to confer jurisdiction upon the United States Court of ' Claims to hear, determine, and render judgment upon the claims of Roy Cowan and others arising by reason of the flooding of land in the vicinity of Lake Alice, North Dakota”, approved June 27, 1956, provides as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claims of Roy Cowan, Dorothy Gessner, Norris Larson, L. A. Anderson, Albert and Evelyn Moen, Allan Overland and Reuben Overland, Reuben Overland, C. N. Barrett, as agent of certain landowners, Joseph Hartl, Annie Elsperger, John F. Elsperger and Kathleen Elsperger, his wife, Robert M. Elsperger, Roman F. Elsperger, Bernard F. Lange, Roy A. Nolti-mier, Donald Noltimier and Agatha Noltimier, his wife, Henry Nol timier, Maude Wright Webster, Ewald Henke, Harry L. Overland and Bella Overland, John Magnuson, Roy G. Sylvester and Walter E. Sylvester, as to the liability of the United States, if any, either legal or equitable, for losses alleged to have been sustained by said persons arising by reason of the flooding of land in the vicinity of Lake Alice, North Dakota, as a result of the activities of the Fish and Wildlife Service in connection with the establishment and maintenance of a migratory wildlife refuge.
Sec. 2. Notwithstanding any statute of limitations or lapse of time, suit upon such claims may be instituted by the claimants within 1 year after the enactment of this Act. Proceedings for the determination of such claims and review thereof, and payment of any judgments thereon shall be had as in the case of claims over which said court has jurisdiction under section 1491 of title 28 of the United States Code.
*699 Sec. 3. Nothing contained in this Act shall be construed as an inference of liability on the part of the United States Government.
2. The 22 groups of plaintiffs named in the special jurisdictional act and listed in the petition filed in this case are the owners and farm operators or tenant farmers on a sharecropping basis of numerous tracts of land which are located for the most part near or adjacent to Lake Alice or to the east and south of Lake Irvine in North Dakota. The various ownerships and their exact location with respect to Lake Alice and Lake Irvine are shown in separate colors on a map placed in evidence.
3. Lake Alice, also known as Lac Aux Mortes, is located in T. 156 N., R. 66 W., Ramsey County, North Dakota, and has a surface area of about 3,000 acres. Lake Irvine lies generally to the west and southwest of the southern half of Lake Alice, and the distance between the two lakes at their nearest points varies from less than one-half mile to a mile at the most. Lake Irvine has a surface area of about 4,000 acres. In early July 1957, the depths of the water in Lake Alice varied generally from 2.2 to 2.7 feet, with the greatest depth being 3.7 feet. These water depths existed on Lake Alice when the water level was 1441.7 feet m. s. 1. at a time when the bottom of the outlet to the lake was at 1441.8 feet. At the same time, Lake Irvine had a depth of 3.3 "feet, with two areas at the north and south ends as shallow as 2.7 feet, and Lake Irvine then had a water level at 1441.1 feet m. s. 1. with the bottom of its outlet then at 1441.3 feet.
4. Chain Lake, which actually consists of two separate and irregularly shaped lakes, sometimes called the Twin Lakes, lies to the east and southeast of Lake Alice in T. 156 N., Rs. 65 and 66 W. The westernmost boundary of north Chain Lake is about one-half to three-fourths of a mile directly east of Lake Alice. South Chain Lake is about 2 miles southeast of Lake Alice in T. 156 N., R. 65 W. North and south Chain Lake each has a surface area of approximately 1,200 acres and is quite shallow, having a maximum depth of 3.6 feet in early July 1957. North Chain Lake then had a water level of 1442.5 feet m. s. 1., and south Chain Lake was at 1443.2 feet.
*700 5. Mauvais Coulee enters the north end of Lake Alice at a point in Sec. 2, T. 156 N., E. 66 W., which is shown on defendant’s exhibit 5. The coulee has numerous tributaries which flow into it at various points north of Lake Alice and carries the drainage from an area of approximately 700 square miles of land located to the north and northwest of Lake Alice. The main course of Mauvais Coulee begins about 28 airline miles north of Lake Alice at or near the north boundary of Sec. 19, T. 161 N., E. 66 W., and meanders in a southerly direction through Brumba Lake and Snyder Lake and then into Lake Alice. Some of its tributaries commence several miles farther from Labe Alice to the northwest. The course of drainage continues from Lake Alice into Lake Irvine through a shallow channel about half a mile long, located in Sec. 21, T. 156 N., E. 66 W., on the southwestern boundary of Lake Alice. The drainage then flows south out of Lake Irvine through a narrow outlet at the southern boundary of the lake in Sec. 32, T. 156 N., E. 66 W., and then through a dug ditch about a mile long in Sec. 5, T. 155 N., E. 66 W., and on down Mauvais Coulee to a point in Sec. 2, T. 155 N., E. 67 W., where the outlet channel from Silver Lake joins Mauvais Coulee, at which point the defendant constructed the Silver Lake dam and spillway hereinafter mentioned in these findings. Thereafter, Mauvais Coulee enters Pelican Lake in T. 154 N., E. 66 W., and then empties into Devils Lake in T. 153 N., E. 66 W.
A map placed in evidence by defendant graphically illustrates the relative geographical location of the various points and areas mentioned above and in the two preceding findings of fact, being based upon the General Highway Transportation Maps of the North Dakota Department of State Highways, covering Benson, Eamsey and Towner Counties, North Dakota. The red lines and arrows on the map show the general location and direction of the tributaries which flow into Mauvais Coulee from the 700-square-mile drainage area north and northwest of Labe Alice. The lines and arrows in brown and green relate to the Chain Lake and the Dry-Sweetwater Lakes drainage area (hereinafter mentioned), excess waters from which ultimately enter Lake Irvine and then Mauvais Coulee, and finally Devils Lake. In addition, this map shows *701 the relative location of the Hock Lake area hereinafter mentioned.
6. Severe drought conditions existed in North Dakota during the 1930’s as a result of which Lake Alice and Lake Irvine and the other lakes in the Mauvais Coulee area north of Devils Lake became dry, or practically dry. Between 1935 and 1938, the Fish and Wildlife Service of the Department of the Interior established five easement refuges in the Mauvais Coulee area for the protection and preservation of migratory water fowl. These refuges were established at Nock Lake, Brumba Lake, Snyder Lake, Lake Alice, and Silver Lake. The plaintiffs claim that some of the structures which were built by the Fish and Wildlife Service in connection with these wildlife refuges caused their lands to be flooded during various years between 1940 and 1958.
ROOK LAKE
7. Bock Lake is located in Towner County about 30 airline miles north of Lake Alice in Ts. 161 and 162 N., Bs. 66 and 67 W., with an area of approximately 1,600 acres in a watershed of 75 square miles. The lake is slender and Y-shaped. The main body is the base and east arm of the “Y” terminating to the north in upper Bock Lake. This part of the lake lies in a generally northeast-southwest direction and is about 10 miles long. The west arm of the lake lies in a north-south direction and is about 4 miles long. The Bock Lake easement refuge occupies the south half of the main lake.
Except for the period of time during which the defendant maintained a ditch as hereinafter related, there is and has been a natural divide at or near the north boundary of Sec. 19, T. 161 N., B. 66 W., about 1.5 miles south of Bock Lake, at elevation 1534.0 m. s. L, and all drainage north of the divide, including that from Bock Lake and its 75-square-mile watershed, flowed northward into Canada, the drainage south of the divide being to Lake Alice and Lake Irvine.
In 1935, Bock Lake was dry and during late 1935 and early 1936 an earth dam, riprapped on the upstream or southerly side, was constructed by the defendant across the middle of the east arm of Bock Lake in Sec. 28, T. 162 N., B. 66 W., for *702 the purpose of creating a migratory waterfowl refuge by restoring water to the south half of the main body of the lake. The dam was 1,200 to 1,400 feet long, about 12 feet high, and 8 to 10 feet wide at the top. The elevation at the top of the dam was 1533.0 m. s. 1. The water retained by the dam did not reach elevation 1533.0 at any time in the period 1935 through 1946. If it had, the dam would have been washed out and the water would have flowed toward Canada. During this period no water flowed south out of Eock Lake because of the divide at elevation 1534.0. The dam was breached for the first time by a washout which occurred in April 1945. due to heavy spring runoff when the water came within 3 inches of the top of the dam and flowed north. The breach averaged 150 feet in length with an average elevation at 1530.4 feet. Prior to the washout of the dam, 3,900 cubic feet per second of water would have had to flow under free flowing conditions over the dam before water could have flowed south from Eock Lake and over the divide into Mauvais Coulee. With the breach in the dam, an additional-2,100 c. f. s. would have had to flow north to Canada. The dam was restored in the fall of 1946 to its original top elevation of 1533.0, and a 150-foot earth spillway was excavated at the eastern end of the dam to elevation 1529.4. In June 1949, the dam was breached and washed out to elevation 1527.5 by heavy wave action from storms and has remained at that elevation ever since.
8. As a part of the Eock Lake project, the defendant in 1935 constructed a road dike extending east and west on the section line between Sec. 1 and Sec. 12, T. 162 N., E. 67 W., about a quarter mile to the northwest of the north end of the west arm of Eock Lake. A ditch was excavated along the south side of the road dike to a stream bed leading to the north end of the west arm of Eock Lake. The purpose of the dike and ditch was to divert a stream, the natural flow of which was from the southwest into Canada, into the west arm of Eock Lake and thus aid the restoration of the main body of the lake. By October 1944 the water level on Eock Lake had been raised sufficiently so that the defendant at that time opened the road dike and plugged the diversion *703 ditch and caused the stream to resume its natural flow on to Canada.
9. In 1936, the defendant constructed a dike in Sec. 33, T. 162 N., E. 66 W., extending 4Ó0 to 500 feet along tbe eastern shore of the main body of Eock Lake, located about one-half mile south of the dam structure previously described in finding 7. The dike was constructed to a top elevation of 1531.5 feet m. s. 1., with a 15-inch concrete-pipe culvert having a flow line elevation of 1527.49 feet. The purpose of the dike was to prevent the flowage of water from Eock Lake onto the land in Sec. 33, at a point where there was a natural inlet into Eock Lake from a small drainage area. Eock Lake otherwise had substantial banks.
10. Between the fall of 1945 and October 1946 a ditch was excavated by the defendant south of Eock Lake in Secs. 7, 18, 19, 30, and 31, T. 161 N., E. 66 W., for carrying any surplus water from Eock Lake to the wildlife refuges in Brumba Lake and Snyder Lake. The ditch structure connected with the south tip of Eock Lake and ran in a southeasterly direction to a point in Sec. 7 where a natural area existed suitable for a channel way which extended in a southerly direction to a point towards the south end of Sec. 18. The grade of the Soo Line Eailway crossed this channel way at a point in the south half of Sec. 18 and water could pass through the grade only by means of a 48-inch culvert, hereinafter mentioned in these findings. The ditch structure recommenced at the south end of the natural channel way, was about 10 feet wide and about 4 feet deep, and proceeded to a point immediately north of the south line of Sec.-18, where the defendant installed a twin 5-foot stoplog control structure consisting of planks inserted in a concrete base and frames. This structure was about 5 miles south of the Eock Lake dam and 1% miles south of the south end of the lake. It was set in the ditch with a flow line elevation of 1527.0 feet m. s. 1. and with the flowage elevation at the top of the stoplogs at 1530.7 feet. The water course extended southerly a short distance through a naturally low area to a road grade extending east and west along the section line between Secs. 18 and 19, and then through two culverts in *704 this grade. At the north end of Sec. 19 the defendant’s ditch recommenced and extended southerly for about 3 miles through Secs. 19 and 30 and into Sec. 31 where it ended in Brumba Lake. This ditch was 10 feet wide at the bottom with 45-degree side slopes, being generally about 4 feet deep but with a maximum depth of 7 feet at the divide where the natural elevation is at 1534.0 in Sec. 19. As indicated by elevations stated in connection with Brumba Lake and points north thereof, there was necessarily a very gradual decrease in the elevation of the bottom of this ditch from north to south.
In May 1955, the ditch was plugged by the defendant by filling it in for a length of 75 feet in Sec. 19, T. 161 N., It. 66 W., at the high point in the natural divide separating the drainage areas to the north and south. The purpose of the plug was to prevent any possible flow of water south from Bock Lake. The top of the plug was at elevation 1533.75 feet m. s. 1.
It is not contended by plaintiffs that water flowed south from Bock Lake prior to the excavation of the ditch through the divide in the fall of 1946, and it is apparent that none could have flowed south after the plugging of the ditch at the divide in May 1955.
11. During the period of the existence of the defendant’s ditch, from October 1946 until May 1955, there existed the following impediments or obstructions from north to south to the flow of water through the ditch to Brumba Lake:
(1) A cattle pass across the south tip of Bock Lake having a 5-foot by 5-foot opening with a flow line elevation at 1525.42;
(2) a 48-inch corrugated metal pipe culvert through the grade of the Soo Line Bailway, previously described in finding 10, with a flow line elevation at 1527.53;
(3) the twin stoplog control structure described in finding 10;
(4) two 36-inch corrugated metal pipe culverts through the grade of the road extending east and west on the section line immediately south of the twin stoplog structure, the flow line elevations of which were respectively 1527.38 and 1527.54;
*705 (5) and a 36-inch, corrugated metal pipe at flow line elevation 1527.1 and a 48-inch corrugated metal pipe at flow line elevation 1526.94 through the grade in a road across the ditch in Sec. 80. The maximum flow of water through the ditch for any period of time would be controlled by the 48-inch culvert through the grade of the Soo Line Railway, which culvert had a maximum capacity of 110 cubic feet per second, or 220 acre-feet in 24 hours, and this amount of water could have been accommodated by the reservoir areas and capacities of Brumba Lake and Snyder Lake which are located south of these obstructions.
The evidence fails to sustain the plaintiffs’ claim that any of the structures built by the Fish and Wildlife Service at Rock Lake increased the natural flow of water into Lake Alice and caused or contributed to the flooding of their lands.
BRUMBA LAKE
12. The defendant established a wildlife refuge at Brumba Lake in Sec. 31, T. 161 N., R. 66 W., by constructing in 1936 and 1937 a 25-foot-long riprapped spillway to elevation 1528.67 across the outlet channel at the south end of the lake. The water surface area of this lake became 110 acres. The storage capacity of Brumba Lake thus created was 293 acre-feet, whereas previously practically all of the water entering the lake bed escaped through the outlet channel south through Mauvais Coulee to Snyder Lake.
SNYDER LAKE
13. The defendant also established a wildlife refuge at Snyder Lake, a narrow lake somewhat over 2 miles long extending in a north-northwest, south-southeast direction in Secs. 1, 6, 7 and 18, T. 160 N., R. 66 W., commencing about 1 mile south of Brumba Lake. In 1936 and 1937 the defendant constructed an earth dam across the coulee at the southeast shore of Snyder Lake in Sec. 18. This dam was about 7 airline miles south of Rock Lake. It was built 350 feet long, 12 feet thick at the base, 10 feet wide at the top, to a top elevation at 1520.20, with a 30-foot-long rubble masonry spillway with fiowage elevation at 1514.98. The flow line of the spillway was about 4 feet higher than the bottom of the cou *706 lee at that point. The water surface area of this lake became 216 acres. After the construction of this dam and spillway, Snyder Lake had a storage capacity of 1,167 acre-feet, whereas prior thereto, the water entering this lake escaped south through the coulee and into Lake Alice and Lake Irvine.
14. In view of the existence of the natural divide between the Rock Lake drainage and the drainage areas to the south in the period prior to October 1946 and the plugging of the defendant’s ditch and restoration of the divide in May 1955, the only possible years when water could have flowed from Rock Lake to Brumba Lake were 1947 through 1954 and part of 1955. The preponderance of the evidence establishes that only in 1949 did water flow south of Rock Lake into the Lake Alice drainage area.
The highest water levels on Rock Lake, as observed and recorded by the Fish and Wildlife Service, were respectively 1527 for 1947, 1528.4 for 1948, 1531.5 for 1949, 1529.9 for 1950, 1530.3 for 1951,1528.2 for 1952,1527 for 1953,1528 for 1954, and 1529.2 for 1955. These were periodic, generally quarterly, measurements, and were not necessarily made when the lake levels were at their highest, but there is no substantial evidence from which it can be inferred that higher levels were reached in the years 1947, 1948, and 1950 through 1955.
The only year in which the measured water level of Rock Lake exceeded the flowage elevation of 1530.7 at the top of the twin stoplog control structure was 1949, when the measured level of 1531.5 was sufficiently high to cause a flow 0.8 of a foot deep over the top of the stoplogs. This high level of water on Rock Lake in 1949 was observed and measured one day in early spring, probably on or about April 1. At that time and until June 1949 the Rock Lake dam had a top elevation at 1533, with the earth spillway at 1529.4. With the lake level at 1531.5, the flow of water through the 150-foot spillway to the north would have been 2.1 feet deep under free flowing conditions. The measured water level of Rock Lake on or about May 1, 1949, was 1530.4, and on or about July 1, 1949, 1529.0. There is testimony in the record that on one day in late April or early May the water *707 at the twin stoplog controls had inundated the structure. On May 2 and again on May 5, 1949, the Chief Engineer, Fish and Wildlife Service, was at the site of the stoplog structure and observed that the stoplogs were in place and no water was flowing south. There had been exceptionally heavy snowfall in the Rock Lake drainage area during the preceding winter season. As previously stated in finding 7, the Rock Lake dam was breached and washed out to elevation 1527.5 in June 1949 by heavy wave action due to storms.
On May 13,1949, the Assistant Regional Supervisor, Fish and Wildlife Service, inspected the Rock Lake, Brumba Lake and Snyder Lake refuges. Regarding Rock Lake, he reported as follows:
There has been an enormous amount of water at Rock Lake this spring and it was found that the high lake levels and strong winds had severely damaged all of the roadways across the lake. The stoplogs had all been placed in the south structure of this unit to prevent any water from going south to further aggravate the flooded conditions in the farm lands in the Lake Alice-Lake Irwin area. It was found, however, that some individual had removed all of the stoplogs and had floated them down the creek channel. The stoplogs were all retrieved and replaced in the structure. It is not likely that they will remain for any length of time, however, since apparently some individuals in the Rock Lake area have determined that some of the surplus water in that lake should be passed southward. At the time of inspection no water was passing northward but this may have been the result of a strong northwest wind which was blowing since it appeared that there had been a flow through this natural spillway a short time previously.
This Assistant Supervisor testified that the stoplogs had been out for 1 or 2 days. With the stoplogs out, the flow line elevation through the structure was at 1527.0. Immediately following this inspection, the stoplogs were locked in place and have remained so ever since.
With respect to Brumba Lake refuge, the Assistant Supervisor reported that there was a rather large flow in the ditch, that removal of the Rock Lake stoplogs had been the cause, *708 with the result that the stoplogs in the Brumba twin 5-foot stoplog structure had been overtopped by the flow, and a rather severe wash had occurred around the end of this structure, requiring placing of piling and several yards of fill. It was noted that the refuge supervisor was instructed to give top priority to this repair job. ■ The relationship between the Brumba stoplog structure and the Brumba spillway is not established by the evidence.
Begarding Snyder Lake, the Assistant Supervisor reported that a newly placed beaver dam extended across the entire spillway, thereby causing the lake level to rise approximately 6 inches above spillway. The beaver dam was then breached to permit lowering of the water level in order that the spillway repair job could be undertaken as soon as the water level dropped.
After the construction of the structures at Brumba and Snyder Lakes, those lakes had storage capacities respectively of 298 and 1,167 acre-feet. Before the construction, these lake beds had no storage capacity except for the time it took for the runoff to escape through their outlet channels. After these lakes became full and the runoff was complete, evaporation as in part counterbalanced by precipitation resulted generally in a decrease in the level of each lake by about 2 feet in the summer and fall, and by the commencement of the next runoff season Brumba Lake had available out of its total storage capacity about 150 acre-feet for additional storage, and Snyder Lake about 350 acre-feet, or a total of about 500 acre-feet.
LAKE ALICE
15. In 1935 and 1936, Lake Alice was practically dry and during that period the Fish and Wildlife Service established the Lac Aux Mortes (Lake Alice) National Wildlife Befuge. Numerous flooding easements were acquired by the defendant around the meandering shoreline of the lake, which easements are more particularly described in subsequent findings.
For many years prior to construction by the defendant of any structures at Lake Alice, the outlet to Lake Alice was through a shallow channel about 75 feet wide, extending between Lake Alice and Lake Irvine, in the northern part of *709 Sec. 21, T. 156 N., E. 66 W. The evidence is ambiguous as to whether this was originally a natural channel way between the two lakes. The field notes of the 1883 General Land Office survey do not indicate such an outlet from Lake Alice, but describe an inlet into Lake Irvine at that place from the marshes which then existed between the lakes. The 1883 field notes indicate that the natural outlet from Lake Alice at that time was at a point in the south shore of Lake Alice in Sec. 22, where Mauvais Coulee left the lake, bore west and widened out into the marshes lying south of Lake Alice and east of Lake Irvine. The field notes described an inlet into Lake Irvine from these marshes in Sec. 28. The last-mentioned outlet from Lake Alice and inlet to Lake Irvine are at points more than a mile in a southerly direction from the outlet and inlet serving the channel way between the two lakes, as it existed prior to the construction by the defendant of any structures at Lake Alice. This channel way existed in the late 1920’s when a group of farmers cooperated to improve the drainage through this channel from Lake Alice to Lake Irvine by excavating a ditch about 30 feet wide and 20 to 26 inches deep, and extending west from Lake Alice to a point where the channel area leading into Lake Irvine was well defined and required no excavation.
16. In 1935 or 1936 the defendant plugged the existing drainage channel between Lake Alice and Lake Irvine by construction at the meander line of Lake Alice of an earth dam across the channel about 3 feet deep with a rock spillway having a flow line elevation at 1442.80 m. s. 1. The flow line elevation of Mauvais Coulee under the township road bridge immediately south of the outlet of Lake Irvine was and has remained at 1441.2, or 1.60 feet lower than the top elevation of the rock spillway at the outlet of Lake Alice.
In December 1954 the Fish and Wildlife Service in cooperation with the North Dakota Water Commission by use of dynamite removed the spillway and deepened the ditch between the lakes, the ditch being lowered to an average elevation of 1440.8, and the opening at the spillway to 1440.2, thereby providing an open channel between Lake Alice and Lake Irvine, the bottom of which was lower than the outlet channel from Lake Irvine to the south.
*710 17. In 1936 and 1937, when Lake Alice was dry, the defendant constructed a road dike about 6 feet high along the northeast shore of Lake Alice. This dike also extended north from Lake Alice about three-quarters of a mile along the quarter line between the east and west halves of Sec. 2, T, 156 N., R. 66 W., to the county road on the boundary between Towner and Ramsey Counties. Previously Mauvais Coulee after entering the northwest part of Sec. 2 through the county road had turned to the east into the eastern half of Sec. 2 and then curved south and southwest into Lake Alice. The course of Mauvais Coulee was changed in Sec. 2 by construction of a ditch entirely within the western half of Sec. 2, with the result that the natural channel of Mauvais Coulee was blocked by the road dike both where it had crossed to the east into the eastern half of Sec. 2 and where it had previously emptied into Lake Alice. The purpose of the road dike was to prevent high water in the Mauvais Coulee and in Lake Alice from flowing onto the lands to the northeast of the lake. No culverts or control structures were placed in the road dike. The new course of Mauvais Coulee in Sec. 2 was by means of the ditch constructed by the defendant, entirely to the west of the road dike. This ditch was 2.5 to 3 feet deep, 16 feet wide where it commenced at the bridge on the comity line, and about 25 feet wide where it entered Lake Alice.
In late December 1954 and early January 1955, the Fish and Wildlife Service in cooperation with the North Dakota Water Commission breached the road dike along the northeastern shore of Lake Alice, at or about the point where the Mauvais Coulee had previously entered the lake. This breach was a 25- to 30-foot opening to elevation 1443.4. Just prior to the breach of the road dike, the level of the water standing on the low lands on the northeast side of the dike was about 1 foot higher than the water level of the lake. The water flowed from these lands through the opening in the dike into Lake Alice during that winter.
18. The low lands flooded by water impounded by the road dike along the northeast shore of Lake Alice had elevations as low as 1442.0 and 1442.2 and extended in part between the northwest banks of north Chain Lake and Lake Alice. The *711 1883 General Land Office survey indicated that the natural outlet from north Chain Lake was by a channel through the southwest shore. The drainage through this outlet bypassed Lake Alice to the south and proceeded through low lands to the inlet to Lake Irvine, previously described as located in Sec. 28. This natural outlet from north Chain Lake had been plugged by parties unknown. One of the plaintiffs in this case repaired this plug in 1949 and 1950 when it was damaged by water escaping from north Chain Lake at that point. The plug as repaired was a saddle between the higher adjacent banks, was again washed out in 1954, with no further repairs being made. In early July 1957 the top elevation of this plug was measured at elevation 1443.6 feet. As partially washed out, this plug in the natural outlet raised the levels in north Chain Lake to the extent that water could and did back up from north Chain Lake through a low place in the northwest shore and onto the low lands between north Chain Lake and Lake Alice, thereby contributing to the flooding of those low lands.
19. In 1942 the defendant constructed a rockfill or plug across the draw on the section line between Secs. 21 and 22 at the south end of Lake Alice. In 1942 parties unknown had placed earth on the Lake Alice spillway .during the runoff season that year, thereby causing water to cut through the southwest bank. The defendant cleaned the spillway, repaired the cut in the bank, and built the rockfill in the draw. The evidence in this case suggests that the cut in the bank and the draw existed at the point where the field notes of the 1883 General Land Office survey reported the existence of the outlet from Lake Alice.
20. Several of the plaintiffs placed dikes, dams or earth plugs on their lands to prevent particular areas from being flooded. Following the flooding of lands south of Lake Alice in 1942, a group of farmers constructed a dike along the south and southwest shores of Lake Alice in Secs. 21 and 22. According to the profile map prepared by the Fish and Wildlife Service in October 1942, the proposal was to construct this dike to a top elevation at 1445.8 feet m. s. 1. According to a survey conducted by the defendant in late June 1948 this dike was almost a mile long and its top elevation varied be: *712 tween 1444.8 and 1446.8, as compared to the spillway elevation of 1442.6 (which was breached and lowered to elevation 1440.2 by the Fish and Wildlife Service in December 1954). The effect of this dike was to confine waters coming from the north. It was then reported that there was no evidence that water from Lake Alice had topped the dike. The water level on Lake Alice was then at 1443.1, with the flow line of the spillway at 1442.56.
In connection with the survey made on August 6,1942, for preparation of the profile map for the farmer’s dike, the water levels of Lake Alice and Lake Irvine were measured at the respective elevations of 1442.73 and 1440.65 feet m. s. 1.
A contour survey of the township in which Lake Alice and Lake Irvine are located, conducted in June and early July 1957 by the Geological Survey,- Department of the Interior, showed that the lowest place in the banks of Lake Alice along its southerly boundaries was on the farmer’s dike at or about the location of the cut that occurred in 1942. This lowest elevation was 1443.8 m. s. 1. at a time when the outlet to Lake Alice was at 1441.8. The contour survey disclosed no evidence of any area along the banks of Lake Alice that had been washed out.
Another dike, known as the Moen Dike, 1100 feet long at elevations ranging from 1444.0 to 1444.3 was constructed in Sec. 23 along the southeast shore of Lake Alice. Immediately above this dike, just north of Sec. 23, still another dike was constructed by farmers which was about 800 feet long at elevations ranging from 1443.6 to 1444.9.
LAKE IRVINE
21. The natural outlet from Lake Irvine at the south end of the lake in fractional Sec. 32 T. 156 N., E. 66 W., was at elevation 1441.3, or 1.50 feet lower than the Lake Alice spillway elevation at 1442.80. A narrow and shallow channel extended south for a short distance to the township road bridge on the south section line of Sec. 32. This bridge, not constructed or maintained by defendant, had an opening 18 feet wide and 5 feet high, with a flow line elevation at 1441.2 feet m. s. 1. The elevation of the inlet into Lake Irvine on its eastern shore in Sec. 28 was 1441.5.
*713 During the period beginning April 20 and ending April 30, 1956, the Geological Survey measured the flow of water south in Mauvais Coulee to Lake Alice, at a point 1 mile north of the north boundary of T. 156 N., E. 66 W., or almost 2 miles north of the inlet to Lake Alice. During that period, 42,170 acre-feet of water passed south to the Lake Alice-Lake Irvine area. During the same period, the measured drainage of water from this area through the bridge opening immediately south of Lake Irvine was 6,920 acre-feet, and the additional accumulation of water in the Lake Alice-Lake Irvine area for this period was 35,250 acre-feet, which necessarily resulted in the flooding of the low lands about both lakes without regard to any overflow waters from Chain Lake. The 35,250 acre-feet of accumulated water would be sufficient to raise the levels of the combined 7,000-acre surface areas of the two lakes by 5 fleet in depth.
The evidence indicated that the drainage at the outlet from Lake Irvine was very poor and that the outlet was too small, narrow and shallow to handle the amount of water which flowed into Lake Irvine in times of heavy rain and spring runoff. Because of low spots along the eastern shore of Lake Irvine and the flow of water towards Lake Irvine from the Dry Lake-Sweetwater Lake area, the lands to the east of Lake Irvine and south of Lake Alice become flooded very quickly during the spring runoff or in times of heavy rainfall.
SILVER LAKE
22. The Fish and Wildlife Service established a waterfowl refuge at Silver Lake in 1937 and 1938 when, like the other lakes in the Devils Lake basin, this lake was dry or practically dry.
To restore water to Silver Lake, the defendant constructed a dam and spillway on Mauvais Coulee in Sec. 2, T. 154 N., E. 67 W., at a point immediately south of the junction of Little Coulee with Mauvais Coulee. Silver Lake was located about 1 mile west of Mauvais Coulee, and its outlet was through Little Coulee into Mauvais. The purpose of defendant’s dam was to divert the waters impounded back through the deep channel of Little Coulee into Silver Lake.
*714 To the northwest of Silver Lake by about 7 airline miles was located Lake Ibson, the outlet of which was through Little Coulee into Silver Lake. Lake Ibson had a drainage area of about 74 square miles. The drainage area of Mauvais Coulee south of Lake Irvine, added to the drainage area of its tributary from Lake Ibson to the location of Silver Lake dam, amounted to 35.4 square miles.
23. The Silver Lake dam, constructed in 1937, was 350 feet long, 12 feet high, and 10 feet wide at the top. The elevation at the top of the dam was 1445.3 feet m. s. 1. The dam had a rubble masonry spillway 48 feet long at elevation 1439.5 feet, except that a 9-foot portion thereof was a stoplog control structure having a flow line elevation at 1438.30 without the stoplogs in place. The spillway elevation was 1.7 feet lower than the flow elevation at 1441.2 through the township bridge immediately to the south of Lake Irvine. The Silver Lake dam was 7 or 8 miles south of Lake Irvine.
The lowest elevation at ground level at the location where Silver Lake dam was constructed was 1433.3 feet, or a drop of 7.9 feet from the flow line through the bridge immediately south of Lake Irvine.
24. On May 9,1949, the Fish and Wildlife Service breached the Silver Lake dam by removing a section of the earth dam 30 feet long to an average elevation at 1435.2, or 4.3 feet below the flow line elevation of the spillway. On April 15, 1955, this same opening was lowered an additional 3.7 feet to elevation 1431.5, or 8 feet below spillway elevation, or 1.8 feet below the lowest point in the original ground elevation.
Expert testimony in this case is to the effect that prior to the breaching of the dam, the spillway on Silver Lake dam had a substantially greater capacity than the township bridge opening on the Mauvais Coulee immediately south of Lake Irvine; that the 18-foot-long, 5-foot-high opening on the bridge had a maximum capacity for fiowage of water at 270 cubic feet per second; that the spillway without considering the 9-foot stoplog structure would have a capacity of 350 c. f. s. with a 2-foot-deep flow over the remaining 39 feet. It is apparent that after the breaching of the Silver Lake dam on May 9,1949, the existence of the remaining structures could not have caused or contributed to the flooding of lands *715 in tbe area of Lake Alice and Lake Irvine. The evidence established that the Silver Lake dam, spillway and stoplog control structure at no time caused water to back up in the coulee in an amount sufficient to cause any flooding in the Lake Alice-Lake Irvine area, located some 7 to 11 miles to the northeast, and that these structures did not cause or contribute to the flooding of any of the plaintiffs’ lands.
DRAINAGE AREAS
25. The Devils Lake drainage basin consists of a maximum area of 3,000 square miles. About 800 square miles of this area are located to the south of Lake Irvine, and include among other areas the Lake Ibson and Silver Lake drainage area previously mentioned in these findings. In 1883 Devils Lake had a water level at 1434.4 feet m. s. 1., its highest recorded level prior to that time being Í438.4 in 1867. After 1883, the water level on this lake gradually declined until it reached its lowest levels in 1940, the maximum and minimum elevations that year being 1402.3 and 1400.9 feet m. s. 1., or 32.1 and 33.5 feet lower than the 1883 elevation. After 1940, the water level on Devils Lake gradually rose until it reached elevation 1419.4 in 1956, or a gain of 18.5 feet in depth from its lowest level.
The drainage area of the Devils Lake basin north of the outlet of Lake Irvine consists of a maximum area of 2,200 square miles, as follows:
(a) Dry Lake and Sweetwater (or Morrison) Lake are located respectively about 4 and 10 airline miles southeast of south Chain Lake. Their drainage area covers about 1,000 square miles to the northeast and east of the two lakes. They have substantial reservoir capacities, and in exceptional and infrequent years water has flowed from them to south Chain Lake and then to Lake Irvine, bypassing Lake Alice to the south. The only year in which this occurred during the years 1940 through 1956, was the year 1950, the other previous years being 1903,1916 and 1923. However, lower Chain Lake otherwise has a substantial drainage area to the east and northeast, and after 1947 this lake experienced flooding levels during several of the years involved in this case.
*716 (b) As previously indicated in finding 5, the natural drainage of Mauvais Coulee into Lake Alice was and has been from 700 square miles of land to the north and northwest of Lake Alice, with numerous tributaries supplying the main stream of Mauvais Coulee from south of the natural divide between the Nock Lake drainage area and the Lake Alice drainage area.
(c) The remaining 500 square miles of the maximum drainage area north of the outlet of Lake Irvine constitutes the areas which supply north and south Chain Lake. The major part of this 500 square miles is located to the north and northeast of north Chain Lake, and is drained by a coulee and its tributaries which ultimately empty into this lake at its north end. The 1884 General Land Office map shows a strip of marshland extending between north and south Chain Lake, suggesting the flowage of water between the two lake bodies. However, the preponderance of the evidence is that no such connection between them ever existed. A low township or county road grade has extended east and west between the two lakes ever since about 1929, and no culverts were ever placed through the grade. The original outlet to the north Chain Lake was at its southwest shore, and this outlet was plugged as stated in finding 18. The natural outlet of south Chain Lake is and has been at its northwest shore at elevation 1443.1. The natural drainage from both north and south Chain Labe was through low lands immediately south of Lake Alice and into Lake Irvine in Sec. 28. This area has low elevations at 1441.2, 1441.6, 1442.4, 1443, 1443.1 and 1443.3, and the drainage from north and south Chain Lake through this area into Lake Irvine in Sec. 28, whei'e the inlet is at elevation 1441.5, is slow and sluggish. When Lake Irvine, which is also a shallow lake, having a maximum depth of 3.3 feet with two areas at the north and south ends as shallow as 2.7 feet, fills up, the water overflows the banks at these low points and inundates the plaintiffs’ lands which are east of Lake Irvine and south of Lake Alice.
26. The flooding of lands in the vicinity of Lake Alice and Lake Irvine was discussed in the Ninth Biennial Eeport of the North Dakota State Water Commission, as follows:
*717 MAUVAIS COULEE DRAINAGE PROBLEMS
Mauvais Coulee drains between 800 and 1,000 square miles of land located in Pierce, Benson, Towner, and Bamsey counties. Considerable flooding has occurred in the vicinity of Mauvais Coulee during the past 10 years. This has caused much loss to farmers as a result of inundated farm land. This condition was accentuated during the past summer when from 18" to 20" of rainfall occurred during a 45 day period in the months of May and June, 1954.
Lake Alice and Lake Irvine are a part of Mauvais Coulee. The coulee enters Lake Alice in the upper portion of Bamsey County .and then flows into Lake Irvine, leaving Lake Irvine at the extreme southern point. Approximately 10 miles south of Lake Irvine it is joined by a tributary called Little Coulee. Little Coulee drains approximately 110 square miles of land located in Pierce and Benson counties. The two streams empty into Devils Lake approximately seven miles south of their junction.
During the 1930 drouth period, the stream bed of Mauvais Coulee between Lake Irvine and Devils Lake became partially filled with drift material. As a result the capacity of the stream has been greatly reduced.
The average fall in Mauvais Coulee between Lake Irvine and Devils Lake is .8 of a foot per mile. With the added siltation, the stream flow is very sluggish.
The heavy rainfall that occurred in the upper reaches of Mauvais Coulee during the past summer moved rather rapidly into the Lake Alice and Lake Irvine areas. Water collected in the Lake Alice and Lake Irvine areas as a result of the sluggish flow of Mauvais Coulee. As a result between 12,000 and 20,000 acres of land were inundated in the vicinity of these two lakes. The flood damages were considerably greater in this area than in recent years in view of the fact that farmers had already put their lands into crop. As a consequence, most farmers suffered a loss of approximately $10 per acre.
The State Water Conservation Commission was contacted by a group of farmers affected by the flood conditions relative to methods of correcting this condition. Efforts are being made on the part of the Commission to obtain surveys to correct the situation. The Commission has also taken steps towards interesting the Corps of Engineers and the Soil Conservation Service in constructing flood protection works and watershed improvement facilities.
*718 Several meetings have been held with interested government agencies in an effort to gain project support for the .area. The State Water Conservation Commission contacted the water resources branch of the U. S. Geological Survey relative to making water discharge measurements in the vicinity of Lake Alice and Lake Irvine. This survey estimated that the maximum flow into Lake Alice was 600 cubic feet per second. This flow would be sufficient to cover 1,200 acres of land to a depth of one foot in a 24 hour period. It was determined that the maximum flow from Lake Irvine amounted to 136 cubic feet per second. Consequently only 272 acre feet of water were being removed from the lakes in a 24 hour period by Mauvais Coulee whereas 928 acre feet were being deposited in the area to constitute flood conditions.
27. With the exception of some of the years, the claim years 1940 through 1956 were generally years of high spring runoff in the drainage areas involved in this case. The spring runoffs were not as severe in the years 1940 through 1947 and in 1952 and 1953 as they were in the years 1948 through 1951, and 1955 and 1956. The amount of water which drained into the Lake Alice-Lake Irvine-Chain Lake area in some years greatly exceeded the reservoir capacities of the lakes and the capacity of the outlet of Lake Irvine to discharge. The result was that in various runoff periods there was substantial flooding of the low lands at or near these lakes. Because these lands were low and had poor drainage, the water stood for substantial periods of time until it was too late to plant crops. The year 1954 was different in that flooding was extensive but not due to the spring runoff. No flooding occurred in the 1954 springtime, and the crops had been planted upon the affected lands. However, unprecedented rains occurred in the drainage areas involved in June 1954 which resulted in a rapid runoff into the Lake Alice-Lake Irvine-Chain Lake area and the low lands were again flooded and the crops growing thereon destroyed. Pressure had mounted among the farmers, and the Fish and Wildlife Service, in cooperation with the North Dakota State Water Conservation Commission, by January 1955 had breached or removed all of the refuge structures, as previously described in these findings. Despite *719 the breaching or removal of the structures, the flooding of the low lands occurred again in 1956. The snowfall in the winter preceding the 1956 runoff was the second heaviest during the period of years involved, being exceeded only by the snowfall in the winter preceding the flooding in 1950. No flooding of lands had occurred in 1957 prior to the trial of this case in late July 1957. The preceding winter had been one of light snowfall.
Comparative, official climatological data of the U.S. Weather Bureau at Devils Lake, prior to and after the removal of the Fish and Wildlife Service structures in the Lake Alice-Lake Irvine area, tend to establish that the presence of the structures complained of by the plaintiffs did not cause, affect or contribute to the flooding of the plaintiffs’ lands. The heaviest snowfall on record, totaling 88.4 inches, occurred in the winter of 1949-50, and in June 1954 the rainfall was- also the heaviest on record. Considerable flooding of the plaintiffs’ lands occurred in those years. The U.S. Weather Bureau records, however, also show that in 1956, approximately a year and a half after the Fish and Wildlife structures in the Lake Alice-Lake Irvine area had been breached, blown out or removed, there were 80.2 inches of snowfall that winter, the second heaviest on record, and the rainfall in June of that year was also the second heaviest on record. The plaintiffs’ lands were flooded to approximately the same extent in 1956 as in previous years even though all of the structures complained of had been breached or removed.
In an official document, entitled “Chemical Quality of Surface Waters in Devils Lake Basin, North Dakota,” prepared by the Geological Survey as part of the program of the Department of the Interior for development of the Missouri Liver basin, which document was published in 1955, an extensive review of the drainage problems in. the Devils Lake basin is set forth. It is stated that runoff in the basin shows little relation to annual precipitation, and that precipitation in the summer and early fall produces little runoff, that runoff is derived almost entirely from snowmelt and spring rains, and that most of the runoff is generated either when the ground is frozen or immediately after the ground thaws *720 in the spring. It is further stated that for a set amount of precipitation, runoff in the basin tends to be greater when temperatures are below normal. It further stated, as follows:
From October 1930 to October 1940 the surface of Devils Lake fell about 10 feet. During this 10-year period the precipitation averaged 15.9 inches, the temperature averaged 39.1 degrees, and the estimated evaporation from the lake averaged 34.1 inches. During the 10-year period that ended October 1, 1950, the lake rose 14 feet. The precipitation averaged 18.2 inches, the temperature averaged 38.5 degrees, and the estimated evaporation averaged 27.5 inches. During this second 10-year period, the precipitation and temperature were each slightly above their longtime averages, and the estimated evaporation was about 8 percent lower than average. Although climatological averages are not too significant in relation to runoff and lake altitudes, nevertheless the 14-foot rise in lake level during 10 years when the temperature, precipitation, and evaporation were not far from average is noteworthy. This rise in lake level is not likely to have been caused by changes in agricultural practices but probably was due to small changes in the weather. Similarly, small changes in weather in the future may determine the size of Devils Lake and the other lakes in the Devils Lake basin unless water is diverted to them from a source outside the basin.
In an official publication of the Weather Bureau, Department of Commerce, entitled “Local Climatological Data With Comparative Data, 1956, Devils Lake, North Dakota,” it is stated that snowfall at that community averages 35 inches annually, occurring mostly between early November and early April, that the ground is usually snow covered from around the middle of November to near the end of March, and that the weather usually warms up. rapidly in April. The average date of the last killing frost in spring is May 15, and of the first killing frost in autumn, September 24, giving a growing season of 132 days. Normally about 50 percent of the annual precipitation occurs in May, June, July and August in showers and thunderstorms.
The. city of Devils Lake, North Dakota, is located about 18 miles to the southeast of Lake Alice, and the weather conditions are substantially comparable. The evidence in this *721 case establishes that snowfall in the Rock Lake drainage area and in the northern part of the Lake Alice drainage area is usually somewhat heavier than in the vicinity of Lake Alice.
The following table shows the monthly and seasonal snowfall records at the city of Devils Lake, North Dakota:

*722 The evidence establishes that extensive flooding of the low lands in the Lake Alice-Lake Irvine-Chain Lake area occurred in some of the years prior to 1930.
28. Pursuant to North Dakota statutes, various water conservation and flood control districts have been organized and established throughout the state. These districts are legal entities to which the people within specific areas can present water problems. The Tenth Biennial Report of the North Dakota State Water Conservation Commission, for the period July 1,1954 to June 30, 1956, contained the following statements with respect to the activities of two of the water districts:
CHAIN LAKES
The Chain Lakes Water Conservation and Flood Control District is located in northwestern Ramsey County. The district was organized in the spring of 1955 for the purpose of providing a means to alleviate flooding of lands located in the Lake Alice-Lake Irvine areas. Approximately ten to fifteen thousand acres of fertile agricultural land have been inundated eight out of the past eleven years resulting in considerable financial losses to many of the residents of this district.
Staff members of the State Water Conservation Commission recommended to the district that a project be instituted which would involve participation between the Soil Conservation Service, the Corps of Engineers, and the State Water Conservation Commission. It was proposed that the Soil Conservation Service be charged with the responsibility of conducting a watershed development program in the upper reaches of Mauvais Coulee, the Corps of Engineers be authorized to construct a channel for the outlet of Lake Irvine to Devils Lake proper and through the present Mauvais Coulee.
It was found that approximately two to four feet of soil drift had filled m the channel during the 1930 drought period to contribute materially to the retarding flow of waters in the Mauvais Coulee. The State Water Conservation Commission was requested by the board to provide a control structure at the outlet of Lake Irvine which would permit the regulation of waters from the Lake Alice-Lake Irvine area which could constitute reservoirs during the flood stage. In February and March, 1955, the State Water Conservation Commission was authorized to make a survey from the outlet of Lake Alice to the inlet of Mauvais Coulee in Devils Lake *723 proper. The survey has been completed. The State Water Conservation Commission also participated with the Federal Fish and Wildlife Service in the “blowing out” of a channel between Lake Alice and Lake Irvine. This was done in an effort to expedite the flow of water from inundated areas adjacent to Lake Alice. The costs of the project were shared equally by these two agencies.
Time is of the essence in accomplishing some partial flood relief for this area. The Chain Lakes District requested the State Water Conservation Commission to furnish them with an estimate of a project that would provide them with partial relief. The State Water Conservation Commission estimated the cost of such a project to be approximately $50,000. This would provide a 40-foot channel from the outlet of Lake Irvine to Pelican Lake and care for incidentals incurred in the required excavation.
The district is now spreading a special assessment levy against all benefited lands in an effort to obtain sufficient funds to permit them to participate in a project that would provide partial relief. The State Water Conservation Commission in cooperation with the Bam-sey County Board of Commissioners plans to install control structures in the lower end of Lake Irvine. It is believed that this project will provide relief under most conditions and will permit the farming of a considerable portion of the land until the federal government is in a position to construct a project affording maximum relief.
DRV LAKE-SWEETWATER WATER CONSERVATION AND ELOOD CONTROL DISTRICT
The Dry Lake-Sweetwater Water Conservation and Flood Control District consists of approximately 720 square miles located in Northern Bamsey County. Frequent flooding has occurred on approximately 72,000 acres of valuable agricultural land within the district. The district is created by action of the State Water Conservation Commission on June 10,1955.
It is proposed by the State Water Conservation Commission that the Corps of Engineers, the Soil Conservation Service and the State Water Conservation Commission cooperate in a project to provide relief from future floodings in this area. The State Water Commission’s proposal is that the Soil Conservation Service provide the upper area of the district with soil treatment in accordance with their watershed program. The Corps of Engineers provides diversion facilities whereby con *724 siderable of the floodway could be diverted into Sweet-water Lake increasing the recreation potential of that lake. In time of extreme flooding, this water could be diverted directly into Dry Lake. Dry Lake would be provided with an outlet cutting across in a southwesterly direction to Six Mile Bay in Devils Lake. This proposal would aid considerably in relieving some of the flooding that occurs in the Chain Lakes area. The present outlet for Dry Lake is in the Northwest and water flowing from this outlet spreads over a wide area in the Chain Lakes District. It eventually courses its way into Mauvais Coulee which has inadequate capacity to care for the drainage area to the North of Chain Lakes district. The project when complete will provide farmers in the area with facilities whereby they can eliminate much of the flooding that now occurs in the upper reaches of the Edmore and Starkweather coulees.
29. The topography of the several thousand square miles of land comprising the Devils Lake drainage basin is generally flat, and throughout this entire area there are thousands of potholes and numerous small lakes which retain water year after year during relatively wet weather cycles. These are shown on map No. NM 1411, an official map which was prepared and printed in April 1956 by the Army Map Service of the Corps of Engineers for public use.
Snyder Lake is located approximately 25 miles north of Lake Alice, and the total drop in the elevation of the coulee between these lakes is 72 feet, or an average of about 30 to 36 inches a mile. The drop in elevation of the coulee from Lake Irvine to Devils Lake is less, averaging 0.8 of a foot, or approximately 9.5 inches, a mile. The drainage throughout the Devils Lake Basin is extremely poor and sluggish, particularly in the Lake Alice-Lake Irvine region, due to the flat character of the terrain and the silting and clogging of the Mauvais Coulee.
30. The plaintiffs’ lands are relatively low compared to the surrounding countryside, and since the first official survey by the General Land Office in 1883, have had a history of intermittent and periodic flooding during wet years. Testimony of record describes flooding of these lands in 1906,1908, 1915,1919,1920, during the early 1920’s up to 1925, and 1933.
The original survey by the General Land Office, previously mentioned in these findings, was made between July and No *725 vember 1883 and covered Ts. 155, 156 and 157 N., R. 66 W., and Ts. 156 and 157 N., R. 65 W. The final field notes of the surveyor covering T. 156 N., R. 66 W., where most of the plaintiffs’ lands are located, were made in the fall of 1883. The surveyor found that large areas of land adjacent to Lake Alice and Lake Irvine were covered with water in July 1883, and designated them as meadow or marshlands. They are shown as such on the official maps of the General Land Office which were prepared by the surveyor in 1883. The lands now owned by the plaintiffs, which are the subject matter of this suit, were flooded at the time of the survey to the extent that the surveyor could not establish true corners for various sections but had to use witness corners to mark their location. For example, the official field notes of the surveyor show that witness corners were used to establish the common corners of Secs. 27,28, 33, 34; Secs. 21, 22,27, 28; and Secs. 22, 23,26 and 27.
The field notes of the surveyor also indicate that in July 1883 the water in the Mauvais Coulee north of Lake Alice was 2 feet deep and “sluggish”, and that this water was flooding extensive areas adjacent to Lake Alice and Lake Irvine to depths of 2 or 3 feet, and that in September 1883 there were 2 or 3 feet of water on lands south of Lake Alice and east of Lake Irvine. The surveyor also found that there was an outlet from Lake Alice to the east into marshes lying between Lake Alice and north Chain Lake, in addition to the outlet found in the south banks of Lake Alice in Sec. 22.
On the other hand, the field notes of the surveyor show that the northwest nine sections of T. 156 N., R. 66 W. which are not involved in this case, were good, arable land. Parts of Secs. 26 and 31, and all of Secs. 25, 35, and 36 were described as good farmland. The remainder of the township was found to consist of marshes and wet meadowland, and all of the lands which are the subject matter of this case were designated as such on the official maps of the General Land Office.
After 1883, the lands now owned or operated by the plaintiffs were gradually taken over by settlers, and in nonflooding years cultivation was practiced on more and more of the lands until by 1918, they were either cultivated fields or pastures. *726 By early 1930, nearly all of these lands were under cultivation, and farmers even planted crops in large areas of the dry lake beds of Lake Alice and Lake Irvine. In claim year 1940, the lake bed of Lake Alice was practically dry when inspected on April 22, May 21 and June 21 of that year. In the same year, Lake Irvine was so dry that about 1,800 acres of its bed were farmed that year.
31. Aerial photographs taken in June 1956 by the United States Air Force for the Corps of Engineers in connection with flood control studies covering the entire Devils Lake basin, including the Lake Alice-Lake Irvine area, show a definite correlation between the marsh and meadowland areas indicated on the General Land Office survey maps of 1883 and described in the surveyor’s final field notes, and the areas flooded in 1956. A composite of the aerial photographs taken in 1956 superimposed on the General Land Office survey maps of 1883 shows a striking similarity between the areas flooded in 1883 and 1956, which in many instances were identical.
32. One mile north of the Towner-Ramsey county line in T. 157 N., R. 66 W., is located a township road bridge across Mauvais Coulee, having a span of 120 feet. It was at this place where the Geological Survey measurements of water flow were made in April 1956. One mile to the south of this bridge is another road bridge across the coulee on the county line. This bridge, about three-quarters of a mile north of the inlet to Lake Alice, had a span of 49 feet with an opening for the coulee 8 feet 4 inches high, and there were 19 36-inch culverts placed at intervals in the road grade for a distance of approximately 1 mile. All of the runoff water from the 700-square-mile drainage area north of Lake Alice had to pass through these bridges to flow down the coulee. In April 1956 the water was flooding the areas north of the county line bridge so extensively that water was flowing over the top of the county line road in four places west of the bridge and three places east of the bridge.
33. In 1935 and 1936 some of the plaintiffs, or their predecessors in title, granted easements on parts of their lands to the defendant in connection with the establishment of the Lake Alice wildlife refuge. Each of the easements, placed of record in the office of the Recorder of Deeds, Ramsey County, North Dakota, was in the following form:
*727 EASEMENT
P. N. Gilberg and Karen Gilberg, his wife, grantors, in consideration of $1.00 acknowledged as received, and the benefits to other lands of grantors, convey and warrant to the United States of America by and through the Secretary of Agriculture of Washington, D. C., and their successors and assigns forever:
The exclusive and perpetual right and easement to flood with water, and to maintain and operate an artificial lake, and/or to raise the water level of a natural lake or stream, upon the lands hereinafter described, by means of dams, dikes, fills, ditches, spillways, and other structures, for water conservation, drought relief, and for migratory birds and wildlife conservation purposes, and/or upon said lands and waters to operate and maintain a wildlife conservation demonstration unit and a closed refuge and reservation for migratory birds and other wildlife.
The lands upon and over which said exclusive and permanent rights and easements are granted are described as follows:
SE14SE14 and Lots 1, 2 and 3, Section 14, Township 156 Range 66 and all riparian lands that accrue thereto in the County of Ramsey and State of North Dakota
And for said considerations it is expressly understood that the above specified sum, acknowledged as received, liquidates all damages whatsoever that have occurred or may occur on account of the construction, building, or maintenance of said dams, dikes, fills, ditches, spillways, fences and other constructions, and in the filling and draining of said lake from time to time, or to their successors in title forever; provided that nothing contained herein shall at any future time be construed as including the rights to inundate by means of additional construction any or all of the above described lands beyond the point and/or area flooded by the completed original structure and/or construction.
Dated this 6th day of February, 1935.
(Signed) P. N. Gilberg (L. /S'.).
(Signed) Karen Gilberg (Z. /S'.).
In the presence of:
(Signed) V. Andersen.
(Signed) John Elsberger.
*728 State oe North Dakota,
County of Eamsey, ss.
On this 6th day of February, in the year 1935, before me, the undersigned, a Notary Public in and for the County and State aforesaid, personally appeared P. N. Gilberg and Karen Gilberg his wife, known to me to be the persons who are described in and who executed the within instrument and acknowledged to me that they executed the same.
[seal] (Signed) V. E. Andersen,
Notary Public Eamsey County,
State of North Dakota.
My Commission expires February 20th, 1941.
[notarial seal aeeixed.]
34. In the case of those plaintiffs who allege that their lands were flooded in 1940, 1941, 1943, 1944, 1952 and 1953, it is found that those plaintiffs failed to sustain the burden of proof that their lands were flooded in those years. Flooding of the pertinent lands occurred in varying degrees in the years 1942, 1945 through 1951, and 1954 through 1956.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is therefore dismissed.